UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard A. WHITTINGTON, Richard Wolfe and W. Lewis DeMoss, Jr., Defendants-Appellants.

No. 84–4813.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1986.
Rehearing Denied April 2, 1986.

Bobby D. Sutton, Shreveport, La., for Whittington.

Richard Wolfe, pro se.

McNulty, O'Connor, Stakelum & Anderson, James J. O'Connor, New Orleans, La., for Wolfe.

W. Lewis DeMoss, Jr., pro se.

Wellborn Jack, Jr. (Court-appointed), Shreveport, La., for W. Lewis DeMoss, Jr.

Joseph S. Cage, Jr., D.H. Perkins, Jr., Asst. U.S. Attys., Shreveport, La., for the U.S.

Before RUBIN, RANDALL, and WIL-LIAMS, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The defendants were convicted in a bench trial of various offenses revolving around the alleged submission of a false claim for benefits under the federal Dairy Production Stabilization Act of 1983. In this appeal, they contend that the district court improperly admitted in evidence a document crucial to the government's case, the evidence was insufficient to support their conviction, and the prosecution was guilty of misconduct in threatening to indict potential defense witnesses for perjury with the result that the witnesses claimed the protection of the fifth amendment and refused to testify. We hold that the district court acted within its discretion in admitting the document, the evidence was sufficient to support the conviction of each of the three defendants, and the prosecution did not violate the defendants' rights by its actions. We therefore affirm the judgment of conviction.

## I.

The Dairy Production Stabilization Act[1] was enacted in 1983 to subsidize qualifying milk producers that contracted with the federal government to reduce milk production. To qualify for the subsidies, a milk producer had to be in production as of November 29, 1983, and establish a marketing history of production in the 1982 calendar year or earlier.[2] Louisiana Pacific Resources, Inc., a company tht had been engaged in the dairy business under the name of Riverland Dairy, received payments totaling $139,741.70 under the Act. One of the defendants, Richard C. Whittington, was president of that company and a member of its board of directors; another, Lewis DeMoss, a CPA, was a member of its board and employed part-time as its comptroller. The third defendant, Richard Wolfe, was an entrepreneur who had not been connected previously with the company.

By August 1983, before the Act was passed, Louisiana Pacific's dairy operations had become increasingly unprofitable and its financial condition was critical. The company owed a substantial amount of money to Bossier Bank and Trust Company, and was badly in debt to other creditors. Louisiana Pacific's chief asset was 1,600 acres of land that it used in its dairy operation, and Bossier Bank began advising, indeed, urging, Whittington to sell the dairy property.

Wolfe became interested in buying the property for real estate development. His interest hinged, however, on averting foreclosure by the first mortgagee, so that the mortgage, which bore an attractive 9% interest rate, could be assumed, and on satisfying the second mortgage in favor of the Farmers Home Mortgage Administration for an amount less than the balance due. Whittington and Wolfe began negotiations

**1.** Dairy Production Stabilization Act of 1983, Pub.L. No. 98–180, 97 Stat. 1128 (1983).

**2.** 7 U.S.C.A. § 1446(d)(3)(D)(iii), (F) (West Supp.1985); 7 C.F.R. § 1430.403(c) (1985).

in the summer of 1983. Meanwhile, it was imperative for Louisiana Pacific to satisfy its creditors and to continue its operations while the negotiations with Wolfe and its mortgagees continued. Louisiana Pacific hoped in part to increase revenues by qualifying for payments under the milk diversion program that was then pending in Congress. Although passage of the act was expected, exactly who would receive payments and on what basis was not known until after November 1983, the month of its enactment. Whether Louisiana Pacific was the operator of the dairy on November 29 later became the determining factor in its eligibility for government benefits, but no one then knew that it would be.

Bossier Bank was pressing for progress in the negotiations between Whittington and Wolfe. The defendants contend that, by August 1983, the negotiations had advanced to the point that they were jointly considering ways to continue dairy operations while the negotiations continued. Wolfe did not want to be a dairy operator, but was willing to cooperate with Whittington to find a means to keep the dairy in business pending the sale. At the request of one of the defendants, a Shreveport lawyer had drafted a proposed commercial lease agreement. The defendants assert that this was for discussion only. After a weekend of negotiations, on September 9, 1983, Whittington, acting for Louisiana Pacific, and Wolfe, acting for a company named Triple Crown Farms of Louisiana, Inc., agreed upon a document confected by Wolfe's California lawyer, entitled "Addendum for Notification (sic) of Commercial Lease Agreement," which stated it was effective September 1, 1983.

The government contends that this document was intended to be and was a lease in law and in fact. The defendants maintain that this document was never intended to have legal effect, but represented only "an interim effort" to accommodate the competing interests of Wolfe, who wanted to buy land but not a dairy, and Whitting-

ton, who was under pressure from the bank to demonstrate progress in negotiations. They further contend that Wolfe agreed to execute the document only under several "suspensive" conditions, a type of condition that under Louisiana law prevents a contract from becoming binding unless the conditions are fulfilled.[3] The conditions were never fulfilled, they argue, and the lease was never consummated. Instead, Wolfe and Whittington agreed orally, they say, on or about September 1, 1983, that Triple Crown would manage Riverland Dairy for Louisiana Pacific.

The defendants maintain that Triple Crown continued to manage Riverland Dairy under the oral agreement until February or March, 1984, when a written management agreement was executed and backdated to reflect the management relationship purportedly in effect since September 1983. In the meantime, in January, 1984, Louisiana Pacific applied for subsidies with the United States Department of Agriculture. In April 1984, Louisiana Pacific received $139,741.40 in subsidy payments under the milk diversion program.

The government contends that Louisiana Pacific was ineligible to receive the milk subsidies because, although it could establish a base period of production for the 1982 calendar year, it was no longer in production on November 29, 1983, having by then leased the dairy to Triple Crown. Triple Crown was itself ineligible for the subsidies because it could not establish a 1982 base period. The defense asserted by the defendants was that Triple Crown had not leased the dairy, but was simply managing it for Louisiana Pacific who remained eligible for the milk subsidy benefits.

The government indicted each defendant on four counts. Count one charged DeMoss, Whittington, and Wolfe with a conspiracy in violation of 18 U.S.C. § 371 (1982) to knowingly use false material statements and representations to the Bossier Parish Agricultural Stabilization and

---

**3.** See La.Civ.Code art. 1767 (West Special Pamphlet 1986).

Conservation Service (ASCS) office, the United States Department of Agriculture, to influence that service regarding Louisiana Pacific's eligibility to participate in and to receive payments under the Dairy Production Stabilization Act in violation of 18 U.S.C. § 1001 (1982), and also with knowingly making false and fraudulent claims with the United States Department of Agriculture in violation of 18 U.S.C. § 287 (1982).

Counts two through four charged the defendants with the underlying substantive offenses. Count two charged them with the violation of 18 U.S.C. § 1001 in willfully causing false statements and representations to be made to the Department of Agriculture purporting to establish the existence of a farm management contract rather than a lease agreement between Louisiana Pacific and Triple Crown. Count three charged all three defendants with presenting to that department a claim for payment of $139,741.70 on behalf of Louisiana Pacific, knowing that it was not actually engaged in milk production on November 29, 1983, in violation of 18 U.S.C. § 287. And count four charged that all three knowingly and willfully made a false writing in the form of a letter dated April 18, 1984, representing the management contract to have been effective since September 1983, when they knew that Triple Crown was the lessee of Riverland Dairy at that time, in violation of 18 U.S.C. § 1001.

The district court found DeMoss and Whittington guilty on all four counts, and Wolfe guilty on counts one and four.

## II.

To prove that Louisiana Pacific was not the dairy's operator on November 29, but had by then leased the dairy to Triple Crown, the government sought to introduce the contested lease as Exhibit G–1. The multi-page document was itself a photographic copy of papers used to confect it,

prepared in part by original typing and in part by assembling excerpts from other documents. It purported to bear the signatures of Whittington and Wolfe. Sharon Renee Pope, an employee of Bossier Bank, had signed the document as a witness. She identified her signature, as well as that of Murray Lynn, a vice president of the bank, who had also signed as a witness, Belinda Keener, another bank employee, and Richard Whittington. Although she had not actually seen Whittington sign G–1, she had signed the document as a witness because she was familiar with his signature. Belinda Keener had notarized the document. She testified that Lynn had brought G–1 to her and asked her to notarize it. While she said she did not remember whether she was present when the document was signed, she stated that she was familiar with Whittington's signature and recognized what appeared in the copy presented to her as a "facsimile" of his signature.

Neither witness could identify any of the pages in the document other than the signature page. Neither knew whether the specific pages attached to the proffered copy had been attached when she signed or whether other pages had been attached.

Over the defendants' objection, the district court admitted the document, G–1, stating to defendants' counsel, "in the course of the trial, if you ... present evidence that causes me then to be concerned about whether I made a proper ruling or not, you'll be privileged to again question the ruling and I'll give you that leave." The defendants, relying on Federal Rule of Evidence 104,[4] contend that there was no evidence that any part of G–1 other than the signature page was the same as the document originally signed by the defendants, and that the court's ruling admitting the evidence was conditioned on the later introduction of evidence proving the identity of the rest of G–1.

---

4. Fed.R.Evid. 104 reads in part:
 (b) Relevancy conditioned on fact.—When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court

shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

The argument that the court admitted the document subject to a condition that the government produce additional evidence simply misinterprets the court's ruling. As the court plainly stated, it was instead affording the defendants, who were objecting to admission, an opportunity later during the trial to adduce evidence that might require reconsideration of the ruling.

■ To identify a document sufficiently to warrant its admissibility, a witness need not be able to attest familiarity with every page. Federal Rule of Evidence 901(a) provides that a document is admissible if identified "by evidence sufficient to support a finding that" it is "what its proponent claims." The rules "do not require absolute certainty in authentication." [5] Indeed, were it necessary for a witness to a document to identify every page of the document as a condition of admissibility, few documents would be admissible. A decision that a document is authentic and, therefore, admissible does not determine whether the evidence will be credited by the trier of fact. The opponent may then question whether the challenged document is the same as or different from the one originally signed. As *Weinstein's Evidence* states, "Once the evidence is admitted the question becomes one of credibility and probative force and the trier may ultimately disbelieve the proponent's proof and entirely disregard or substantially discount the persuasive impact of the evidence admitted." [6]

■ G–1 was sufficiently identified by identification of its signature page. Two persons who signed in different capacities identified their signatures and the signature of one of the principals, Whittington. A signature may be identified by testimony of a person familiar with the signature.[7] It is not essential that the witness have been present when the signature was executed.

Proof that a document has been signed is sufficient to charge a signatory with its contents.[8] After admitting G–1 on the basis of evidence sufficient to authenticate it, the court, in its separate role as trier of fact, was required to make an ultimate determination of its genuineness, including whether the entire document was sufficiently identified as the one signed by Whittington and Wolfe.

■ The defendants had ample opportunity to challenge the identity of the remainder of the document, to show how it came to be signed (as they did, at length), and to urge that, although signed, it was not intended to have legal effect. Whether the document was intended to be legally effective was then a separate question. Wolfe testified that shortly after the document was signed he went to Bossier Bank. Lynn, the bank vice president, asked about the progress of the negotiations, and Wolfe told him there had been some progress but the agreement was in suspense. Lynn prevailed upon Wolfe to let him see what Wolfe called the working draft. When Wolfe showed it to Lynn, Lynn then took it without Wolfe's consent and had it notarized. Wolfe said he then picked up the copy and put it back in his briefcase. Thereafter, the FHA refused to reduce the balance on its mortgage of the Louisiana Pacific property so that it could be paid and cancelled, and the parties agreed that the lease was a "dead issue."

As proof that Triple Crown had never been the lessee of the dairy but had managed it for the account of Louisiana Pacific, the defendants introduced a management agreement signed by Louisiana Pacific and Triple Crown in February or March, 1984. The agreement purportedly reflected the relationship under which the two companies had been operating

---

**5.** *Mauldin v. Upjohn Co.,* 697 F.2d 644, 648 (5th Cir.), *cert. denied,* 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983). *See also United States v. Clayton,* 643 F.2d 1071 (5th Cir.1981).

**6.** J. Weinstein & M. Berger, Weinstein's Evidence ¶ 901(a)[01], 901–16–17 (1985).

**7.** Fed.R.Evid. 901(b)(2); *United States v. Barron,* 707 F.2d 125 (5th Cir.1983).

**8.** 7 J. Wigmore, Evidence § 2134, at 719 and n. 2 (Chadbourn rev. 1978).

since September 1983. It stated that Louisiana Pacific remained the operator of the dairy and that the agreement was effective "as of September 1, 1983."

There was other evidence, however, from which the district court might have believed, as it evidently did, that the lease was the real agreement between the parties. We note a few of the facts that might have supported such a conclusion. On behalf of Louisiana Pacific, DeMoss applied for benefits under the Dairy Production Stabilization Act and told the agricultural authorities that the dairy had been leased. A bank employee testified that, in January 1984, he had discussed the milk diversion program with DeMoss and DeMoss told him that "they" were going to have to change the lease agreement to a management agreement to qualify for the program. He said DeMoss stated that the change was urgent, and DeMoss hoped the lawyers knew what they were doing.

In October 1983, Triple Crown applied for membership in a rural electric cooperative. If it had been managing the dairy for Louisiana Pacific, a new membership would not have been needed. Johnny Terrell, Triple Crown's bookkeeper, wrote, "[p]lease be advised that as of September 1, 1983, Triple Crown Farms of Louisiana leased Riverland Dairy's operation. The new account should be billed as follows: Triple Crown Farms of Louisiana...." Also in October 1983, as secretary of Triple Crown, Terrell signed a milk marketing agreement with a milk producers association as if it were marketing milk for its own account. Wolfe testified that the parties executed the document in order to show the bank some progress in negotiations, yet he also said that he did not show Lynn, the bank officer, the document until Lynn urged him

to do so. The two statements appear to be inherently inconsistent.

G–1 was, therefore, properly received in evidence, the ruling was not conditional, and the evidence was sufficient to support the district court's conclusion that it reflected the true relationship between Louisiana Pacific and Triple Crown—that of lessor and lessee.

### III.

■ The defendants contend that the district court erred in denying their motion for acquittal at the close of the government's case. Because the defendants chose not to rely on this motion, but to present evidence thereafter, they waived any objection to denial of the motion.[9] If a defendant presents testimony and asks the jury to weigh the credibility of his witnesses against the evidence presented by the government, he cannot insulate himself from the risk that his evidence will bolster the government's case by filing a motion before proceeding.[10]

### IV.

■ Whittington and DeMoss contend that the evidence is insufficient to support their convictions. The evidence, viewed as a whole and considered most favorably to the verdict, as it must now be,[11] was sufficient to warrant a guilty verdict by a reasonable trier of fact.[12] Whittington and Wolfe admitted that they did in fact sign G–1. With the lease in evidence, the case hinged on whether the judge believed the prosecution's case or the defendants' testimony. That was his province, not ours. Based on the document and other evidence the trier of fact believed that by November 29, 1983, Louisiana Pacific had leased its dairy to Triple Crown. Therefore, the rep-

---

9. *See United States v. Rhodes,* 631 F.2d 43, 44 (5th Cir.1980); *United States v. Evans,* 572 F.2d 455, 479 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978), and cases cited therein.

10. *United States v. Rhodes,* 631 F.2d 43, 44 (5th Cir.1980); *United States v. Belt,* 574 F.2d 1234, 1236–37 (5th Cir.1978).

11. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 703–04 (1942).

12. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2358, 76 L.Ed.2d 638 (1983).

resentations made by Whittington and De-Moss to government agencies that Triple Crown was managing the dairy for Louisiana Pacific, not leasing it, in order to obtain milk diversion program payments, were clearly in violation of federal statutes.

DeMoss also contends that the evidence was insufficient to convict him because it was inadequate to justify the conclusion that he knew the lease was in effect when he applied for milk subsidy benefits. He asserts that he was a part-time employee of Louisiana Pacific, not privy to the negotiations between Wolfe and Whittington, and that he acted only on the instructions of Whittington. DeMoss states that, when he first applied for government benefits, he was under the false impression that the dairy farm was leased. As token that he had not seen the lease, and was in fact unaware of its contents, he notes that at that time he informed the government office that the lease was for six months whereas G–1 was in fact for a different term. He urges that he believed Whittington when Whittington later told him the company did not have a lease. He contends that, in carrying papers to the government office in charge of the milk diversion program, he was nothing more than a "delivery boy." Indeed, DeMoss so testified. But the trier of fact simply did not believe DeMoss and believed the other evidence that pointed to his knowing complicity in the conspiracy.

### V.

■ . Wolfe was acquitted of the charges in counts two and three. He was convicted of the charge in count one, joining in a conspiracy with Whittington and DeMoss, and of the charge in count four, aiding and abetting Whittington in the preparation of the management agreement with the knowledge that this was intended to influence the government's action.

Wolfe contests the sufficiency of the evidence to warrant these convictions. He argues there was testimony that the management agreement was needed for Louisiana Pacific's bankruptcy proceedings, as well as testimony ample to support Wolfe's position—and indeed there was. This, however, is not the test.[13] There was also ample evidence from other sources that warranted the conclusion that Wolfe joined in a conspiracy with Whittington and DeMoss and that he willingly aided and abetted Whittington. As Wolfe correctly points out, 18 U.S.C. § 1001 is a specific intent offense.[14] Therefore, if he believed in good faith that the purported lease was not a binding and legally enforceable obligation, either because he was ignorant of the law or was ill-informed, and if the trier of fact believed this, he could not be convicted.[15] The court, however, after seeing and hearing Wolfe, chose not to believe him and found that he acted knowingly and willfully. In view of the evidence in the record, we refuse to second-guess the trial court.

### VI.

As their last-ditch defense, the defendants contend that prosecutorial misconduct restricted their constitutional rights to compulsory process and due process by intimidating potential defense witnesses into asserting the fifth amendment. This argument has three subparts. The defendants maintain that (1) the trial court improperly permitted the witnesses to invoke the fifth amendment; (2) if the witnesses were entitled to invoke the fifth amendment, this act was compelled by government intimidation in violation of the defendants' due process rights; and (3) in any event, the court should have directed the government to grant the defense witnesses use immunity because they possessed exculpatory testimony essential to the defense.

Specifically, the defendants maintain that Johnny Terrell, Triple Crown's bookkeeper,

---

**13.** *See supra* notes 11 and 12.

**14.** *United States v. Lange,* 528 F.2d 1280, 1286 n. 10 (5th Cir.1976).

**15.** Compare *U.S. v. Burton,* 737 F.2d 439 (5th Cir.1984).

and Murray Lynn, a vice president of Bossier Bank, each had given a statement to federal investigators or, in Terrell's case, had testified before the grand jury to facts that supported the defendants' version of events. Each had been subpoenaed to testify for the defense. On the day trial began, however, the prosecution served a subpoena on Lynn to testify for the government. Although Terrell had previously appeared before a grand jury to testify about the matters involved in this case and had been indicted for perjury, Lynn had not yet given testimony in any judicial proceeding. The defendants argue that, since Lynn's prospective testimony would have been favorable to their case, the only purpose for the subpoena was to intimidate Lynn and to imply that Lynn might likewise be indicted if he testified to the same facts as he had given federal investigators. Terrell and Lynn informed the district court that they would refuse to testify on the ground that their testimony might incriminate them.

The defendants argue that the district court improperly upheld the witnesses' claim of privilege because the witnesses were not in fear of prosecution for past conduct, a necessary condition for invoking the fifth amendment. Instead, the defendants claim that the witnesses were intimidated by prosecution threats of an indictment if they chose to testify truthfully at the trial.

 Under this standard, the district court properly sustained Terrell's invocation of the privilege. The district judge held an in camera hearing and determined that Lynn was entitled to fifth amendment protection as well. The record of that hearing shows that Lynn was already under investigation for obstruction of justice for giving false information in statements to government agents. If Lynn testified at

the trial, there were two possible consequences: Either Lynn would testify contrary to his prior statements to the government agents, thus providing evidence that those statements were false, or he would testify in conformity with his prior statements, thereby adding a perjury count to the possible indictment for obstruction of justice. The record thus supports the judge's determination that Lynn had a legitimate fear of prosecution and was entitled to invoke the fifth amendment.

 A witness may not claim the privilege of the fifth amendment out of fear that he will be prosecuted for perjury for what he is about to say.[16] The shield against self-incrimination in such a situation is to testify truthfully, not to refuse to testify on the basis that the witness may be prosecuted for a lie not yet told. A witness may, however, claim the privilege if his testimony may suggest that he has already committed a crime, for example, perjury in a prior proceeding.[17]

Second, the defendants contend that the government interfered with their right to a fair trial by intimidating Lynn and Terrell. The defendants complain that the intimidation is evidenced by the indictment of Terrell for perjury because of his earlier testimony before a grand jury that the lease never took effect, by the threat to Lynn of a similar indictment if he so testified at the trial, and by the government's refusal to grant these witnesses immunity so that they might testify without fear of reprisal.

 The Supreme Court has held that the sixth amendment right to compulsory process guarantees a criminal defendant the right to present witnesses to establish his defense.[18] This right is not unlimited; the defendants' sixth amendment rights do not override the fifth amendment

16. *United States v. Partin,* 552 F.2d 621, 632 (5th Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977).

17. *Id. See also United States v. Wilcox,* 450 F.2d 1131, 1141 (5th Cir.1971), *cert. denied,* 405 U.S. 917, 92 S.Ct. 944, 30 L.Ed.2d 787 (1972).

18. *Washington v. Texas,* 388 U.S. 14, 17–19, 87 S.Ct. 1920, 1922–23, 18 L.Ed.2d 1019, 1021–23 (1967).

rights of others.[19] Nonetheless, substantial governmental interference with a defense witness' choice to testify may violate the due process rights of the defendant.[20]

In some instances, we have held that government conduct so intimidated a potential defense witness as to deprive the defendant of his due process rights. Thus, in *United States v. Hammond*,[21] we found such a violation when an FBI agent told a defense witness during a trial recess that the witness would have "nothing but trouble" if he persisted in his testimony and then subpoenaed the witness to appear before a grand jury, with the result that the witness subsequently asserted the fifth amendment. Similarly, the Third Circuit held in *United States v. Morrison*[22] that the government had improperly intimidated a defense witness by issuing a subpoena to her and conducting a personal interview with her in which the United States attorney warned that she might be prosecuted on drug charges and for perjury if she testified at the defendant's trial. The court further held that, if this witness invoked the fifth amendment at the retrial, the court was to direct the government to grant her use immunity.[23]

A prosecutor may, however, engage in proper investigatory actions if his conduct is not designed to intimidate a witness. The prosecutor's hands are not tied so tightly as to prevent good faith efforts to avert perjury or to investigate past offenses. Thus, we refused to find reversible error in the government's conduct in *United States v. Fricke*,[24] when the prosecution informed prospective defense witnesses that they were already targets of a grand jury investigation. We held that, so

long as the investigation of witnesses is not prompted by the possibility of the witnesses testifying, and so long as the government does not harass or threaten them, the defendant's rights are not violated.[25]

In this case, Lynn had been under investigation for obstruction of justice before the trial. We had quashed an earlier grand jury subpoena issued to him because we concluded that the United States attorney was using the grand jury as a discovery tool. The issuance of another subpoena to Lynn in court just prior to his testimony was unseemly, but we do not think it has been shown to constitute a deprivation of the defendants' due process rights. The government's investigation of Lynn was not prompted by Lynn's prospective testimony as a defense witness. Nor did the prosecution attempt to intimidate Lynn by warning him of the consequences of testifying in the manner that was found so offensive in *Hammond* and *Morrison*. The government simply told Lynn that it believed he had already given false statements to government agents and that, if he repeated those statements under oath at trial, they would support an indictment for perjury. We do not feel that this was governmental interference in violation of the defendants' due process rights.

As their third argument, the defendants assert that the district court ought to have directed the government to grant Lynn and Terrell use immunity because of the essential exculpatory nature of their testimony. The defendants, however, were not entitled to have their witnesses immunized from prosecution either for past conduct or, of course, for perjury

**19.** *United States v. Lacouture*, 495 F.2d 1237 (5th Cir.), *cert. denied*, 419 U.S. 1053, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974).

**20.** *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980).

**21.** 598 F.2d 1008 (5th Cir.1979). *See also United States v. Henricksen*, 564 F.2d 197 (5th Cir.1977) (defense witness intimidated by terms of a plea bargain).

**22.** 535 F.2d 223 (3d Cir.1976).

**23.** *Id.* at 229. *See also United States v. Thomas*, 488 F.2d 334 (6th Cir.1973) (defense witness intimidated by remarks by assistant United States attorney).

**24.** 684 F.2d 1126 (5th Cir.1982), *cert. denied*, 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 480 (1983).

**25.** *Id.* at 1130.

if they testified falsely at the trial. In this circuit, the compulsory process clause does not entitle the defendant to require the government to grant immunity to his witnesses.[26] Although the Third Circuit has held differently,[27] we have rejected its view and held in *Autry v. Estelle*[28] that in the absence of governmental abuse the court may not direct the government to grant use immunity to a defense witness who invokes the fifth amendment.

## VII.

For the reasons set out above, the judgment of conviction as to each defendant is AFFIRMED.

---

**26.** *Mattheson v. King,* 751 F.2d 1432, 1433 (5th Cir.1985); *Autry v. Estelle,* 706 F.2d 1394, 1401 (5th Cir.1983), *cert. denied,* 465 U.S. 1085, 104 S.Ct. 1458, 79 L.Ed.2d 906 (1984); *United States v. Chagra,* 669 F.2d 241, 259–61 (5th Cir.), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Thevis,* 665 F.2d 616, 639–41 (5th Cir.), *cert. denied,* 459 U.S. 825, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982).

**27.** *See Government of Virgin Islands v. Smith,* 615 F.2d 964 (3d Cir.1980).

**28.** 706 F.2d 1394, 1401 (5th Cir.1983).