914 F.2d 259
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Van YUILL, aka Derrick Williams, Defendant-Appellant.
 No. 90-3044.
 United States Court of Appeals, Sixth Circuit.
 Sept. 11, 1990.
 
 Before BOYCE F. MARTIN, Jr. and WELLFORD, Circuit Judges, and SILER*, Chief District Judge.
 PER CURIAM.
 
 
 1
 Defendant, Derrick Williams,[1] was indicted on drug offenses, particularly charging him with: (1) conspiracy to possess with the intent to distribute cocaine base (21 U.S.C. Sec. 846); (2) possessing with the intent to distribute cocaine base and aiding and abetting (21 U.S.C. Sec. 841(a) and 18 U.S.C. Sec. 2); and (3) using a false social security number (42 U.S.C. Sec. 408(g)). The jury returned guilty verdicts against the defendant on these three counts. The defendant filed a timely notice of appeal.
 
 
 2
 In May of 1988, police detective Brenda Trout and a confidential informant went to an alleged crack house on 940 Studer Avenue in Columbus, Ohio, in order to buy crack cocaine. Individuals at 940 Studer informed them that they should go to 798 East Fulton to buy the crack. The informant purchased crack cocaine with "City" money. The serial numbers had been recorded by Detective Trout. On May 10, 1988, Trout and the informant purchased more crack cocaine at 798 East Fulton. Based on their purchases of crack at 798 East Fulton, Trout obtained a search warrant for the premises.
 
 
 3
 Various officers executed the search warrant at 798 East Fulton. A number of people, including the defendant Williams, were found inside of the house. Police found a large amount of crack cocaine, as well as cash, on several people inside the house. Officers searched the defendant and found him in possession of five rocks of crack cocaine. The defendant also had $249, of which two of the bills were twenty dollar bills whose serial numbers Trout had previously recorded. The defendant identified himself to the officers as "Van Yuill" and gave them Van Yuill's social security number. As a result, the police officers did not locate the defendant until approximately one year after he was indicted.
 
 
 4
 At trial, the government called Eric Ford to testify. Immediately after his arrest and approximately one week before the defendant's trial, Ford had told the government prosecutors that the defendant was selling crack cocaine at 798 East Fulton. However, when asked by the prosecutor at trial whether the defendant was selling drugs at 798 East Fulton, Ford responded negatively. At this point, the jury was excused, and the court conducted a voir dire. The court concluded that because the government was "surprised" at this witness' testimony, the government could cross-examine Ford as an adverse witness for the limited purpose of impeaching him with his prior inconsistent statements to the government.
 
 
 5
 Ricky Hollins, the lessee of 798 East Fulton, testified that he allowed several individuals to use the residence as a crack house. He testified that the defendant was working at the house selling crack cocaine. The defendant also testified in his defense. He denied selling crack cocaine, and instead claimed that he went to the house involved only to buy crack for personal use. At one point in the trial, counsel for the defendant attempted to call Richard Harrison as a witness on defendant's behalf. Counsel informed the court that Harrison intended to testify to matters which might incriminate him. The court subsequently advised Harrison of his rights and inquired whether he wanted to invoke or waive his fifth amendment right against self incrimination or whether he wanted to testify on the defendant's behalf. Harrison stated that he did not want to testify.
 
 1. Section 408(g) Count
 
 6
 The defendant's argument on the Social Security count is that his conviction for violating 42 U.S.C. Sec. 408(g) was error because this section applies only to individuals who supply false identification to the Social Security Administration.[2] While we have not ruled on this particular issue, other circuit courts have held that one may violate Sec. 408(g) by falsely representing to a private party, rather than to the Social Security Administration, that another's social security number is his own. See United States v. Holland, 880 F.2d 1091, 1095 (9th Cir.1989) (conviction of defendant for violating Sec. 408(g) affirmed when defendant falsely represents his social security number to payroll agent); United States v. Darrell, 828 F.2d 644, 647-48 (10th Cir.1987) (conviction of defendant for violating Sec. 408(g) when defendant falsely represents his name and social to a bank and to a local police officer); United States v. Bales, 813 F.2d 1289, 1297 (4th Cir.1987) (conviction of defendant for violating Sec. 408(g) affirmed when defendant falsely represents his name and social security number to a bank officer). We conclude that neither the plain language of the statute nor the legislative history supports defendant's argument. Accordingly, we find this assignment of error to be without merit.
 
 2. Ford's Testimony
 
 7
 The defendant's next argument is that he was prejudiced by the government's use of witness Eric Ford's prior inconsistent statement for impeachment purposes.[3] Soon after he was arrested, Ford told law enforcement officials that the defendant had been selling crack cocaine out of co-defendant Hollins' house on the day he was arrested. Approximately one week before trial, Ford spoke with the government and reiterated the same story. On September 5, 1990, counsel for the defendant obtained a writ of habeas corpus for Ford as a defense witness. The writ, a copy of which was served upon the government, provides that defense counsel intended to call Ford as a witness for the defense and that Ford planned to testify that the defendant was not selling crack cocaine on the day he was arrested.
 
 
 8
 At trial, the government called Ford as a witness during its case-in-chief. Contrary to what he had previously told the police on two separate occasions (but in accordance with the writ), Ford now asserted that the defendant was not selling crack cocaine on the day he was arrested. The government, claiming surprise under Fed.R.Evid. 607, was permitted to use Ford's prior inconsistent statement to impeach him. The defendant contends that it was error for the court to allow the government to impeach Ford. We also find this argument to be without merit.
 
 
 9
 Fed.R.Evid. 607 provides that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." Rule 611 provides that a hostile witness can be attacked through the use of leading questions. In United States v. Harris, 523 F.2d 172 (6th Cir.1975), three co-conspirators had given FBI agents information that the defendant had aided and abetted in both planning and carrying out a bank robbery. One day prior to trial, the government was advised that the three co-conspirators planned to recant their statements to the FBI agents. At trial, each of co-conspirators denied that the defendant had participated in the bank robbery. The government sought to impeach each of the co-conspirators with her prior statements. The trial court initially denied the government's request because the government had notice that they intended to recant their statements. The court then held a voir dire outside the presence of the jury. The trial court found that the witnesses were hostile, so the court allowed the government to use the prior statements for the limited purpose of impeaching the witnesses. We held that it was entirely proper for the court to allow the government to impeach these witnesses. Id. at 174-75. To the same effect, see United States v. Allen, 522 F.2d 1229, 1233 (6th Cir.1975), reh'g denied, Allen v. United States, 425 U.S. 985 (1976), and United States v. Webster, 734 F.2d 1191, 1192-93 (7th Cir.1984).
 
 
 10
 As defendant points out, it is true that it would be unfair for the government deliberately to call a witness knowing that witness expected to testify favorably for the defendant and then introduce damaging hearsay evidence in the form of a prior inconsistent statement in hopes that the jury would treat such evidence as substantive. See Webster, 734 F.2d at 1192 (allowing the government to engage is such a practice would be "an abuse of the rule"). However, the Webster court rejected a requirement that the government be "surprised" and "harmed" before it could impeach such a witness and instead adopted a "good faith" analysis. Id. at 1193 (where there is no bad faith on the prosecutor's part, the prosecutor may use a prior inconsistent statement to impeach the witness).
 
 
 11
 We do not find that the district court's decision was clearly erroneous in concluding that the government was surprised about changed testimony, although it knew that the defendant intended to call Ford as an exculpatory witness. We find no basis to conclude bad faith on the part of the government here. Despite notice that the defendant intended to call Ford, the government might reasonably believe that Ford planned to testify in substantial conformity with the two statements he had given soon after his arrest and approximately one week prior to trial. We conclude, therefore, that there was no demonstrated error in the trial court's allowing the government to impeach Ford with his prior inconsistent statement.[4]
 
 3. Harrison's Fifth Amendment Claim
 
 12
 The defendant's next argument concerns the trial court's advising potential defense witness, Richard Harrison, of his fifth amendment right against self incrimination. At the time of trial, Richard Harrison was an unindicted co-conspirator.[5] Defense counsel advised the court that Harrison was expected to testify as to matters that would incriminate him. Harrison was to testify that it was he, not the defendant, who was selling drugs at the residence on the day defendant was arrested, as well as other exculpatory statements. The court asked the government whether it intended to prosecute Harrison for the events which took place at the house on the day the defendant was arrested. Counsel for the government indicated that he planned to apply to the Justice Department for permission to prosecute Harrison.[6] Upon hearing this, the court advised Harrison that because he planned to incriminate himself, he could either testify and perhaps incriminate himself, refuse to be a witness for the defendant, or take the stand and then invoke his fifth amendment right not to incriminate himself. Harrison chose the latter alternative.
 
 
 13
 The defendant contends that the trial court violated his sixth amendment right to compulsory process by advising Harrison of his rights under the fifth amendment. He argues that such advice equalled intimidation of Harrison, thereby precluding him from testifying. This argument, however, is misplaced. While a defendant has a sixth amendment right to present witnesses on his own behalf, "[t]his right is not unlimited; the defendants' sixth amendment rights do not override the fifth amendment rights of others." United States v. Whittington, 783 F.2d 1210, 1218-19 (5th Cir.), cert. denied, Whittington v. United States, 479 U.S. 882 (1986); see also United States v. Paris, 827 F.2d 395, 398-99 (9th Cir.1987). However, where the government intimidates a potential defense witness into not testifying, the defendant's due process rights may have been violated. United States v. Hammond, 598 F.2d 1008, 1013 (5th Cir.1979).
 
 
 14
 A thorough review of the trial transcript reveals no threats or intimidating language on the part of the district court judge. There is simply no evidence of any intimidation as claimed. Harrison, a youthful potential defendant, simply chose not to testify after being advised of the consequences of his actions. We find no error in the court's advising Harrison of his fifth amendment rights.[7]
 
 4. Sufficiency of Evidence
 
 15
 The defendant's final argument is that there was insufficient evidence to convict him on counts one (conspiracy to possess with intent to distribute) and two (possessing with the intent to distribute). This argument must be rejected. "In reviewing the convictions, this Court may not reverse the jury's verdict if there is substantial evidence to support it. The Court must construe the evidence in the manner most favorable to the Government." United States v. Chandler, 752 F.2d 1148, 1151 (6th Cir.1985) (citations omitted). In this case, there was clearly sufficient evidence from which a jury could find the defendant guilty of counts one and two.
 
 
 16
 There was evidence that upon his arrest, the defendant was in possession of a sizeable amount of cocaine, that he had approximately $250 on his person, that he also had in his possession a marked ten dollar bill which a confidential informant had used previously to purchase crack cocaine at the house where defendant and the others were arrested. Ricky Hollins testified that the defendant had bragged with other co-conspirators about how much money they had made selling crack cocaine at other crack houses. On the witness stand, the defendant stated that he went to that particular house so that he could purchase a sufficient amount of crack cocaine for he and his friends to smoke. The evidence was sufficient in our view.
 
 
 17
 We accordingly AFFIRM.
 
 
 
 *
 The Honorable Eugene E. Siler, Jr., Chief Judge, United States District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 At oral argument, defendant's counsel announced this to be defendant's correct name. We use it, therefore, rather than Yuill
 
 
 [2]
 Under section 408(g):
 Whoever--
 (g) ... for the purpose of obtaining anything of value from any person, or for any other purpose--
 * * *
 (2) with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary to him or to another person, when in fact such number is not the social security account number assigned by the Secretary to him or to such other person; ...
 shall be guilty of a felony.
 (emphasis added).
 
 
 [3]
 Eric Ford was a named co-conspirator and co-defendant in this case
 
 
 [4]
 Defendant also makes a hearsay objection to Ford's testimony. Because the government was not offering Ford's prior statements for "the truth of the matter asserted," there is no hearsay problem in the use of Ford's testimony to impeach him
 
 
 [5]
 Harrison was a juvenile at the time of the offense
 
 
 [6]
 The federal government never did prosecute Harrison. Rather, Ohio juvenile authorities later filed charges against Harrison
 
 
 [7]
 The defendant also argues that the court should have appointed private counsel to advise Harrison of his rights. We are not persuaded by the argument