[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15680
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 16, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-20153-CR-CMA

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JULIETTE PETIT FRERE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 16, 2009)

Before TJOFLAT, MARCUS and FAY, Circuit Judges.

PER CURIAM:

Juliette Petit Frere appeals her conviction for conspiracy to commit credit card fraud, in violation of 18 U.S.C. § 1029(b)(2), (a)(2)-(4). She raises two arguments on appeal. First, she contends that the government violated her due process rights by substantially interfering with a witness's decision to testify on her behalf. Second, she contends that the evidence was insufficient to support her conviction. For the reasons set forth below, we affirm.

**I.**

A federal grand jury returned a second superseding indictment against Petit Frere, charging her with conspiracy to: traffic in or use unauthorized access devices (credit cards), in violation of 18 U.S.C. § 1029(a)(2); possess with intent to defraud 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3); and possess with intent to defraud device-making equipment (a credit card skimming device), in violation of 18 U.S.C. § 1029(a)(4); all in violation of 18 U.S.C. § 1029(b)(2). The indictment also charged Petit Frere with five related substantive counts.

Four co-conspirators who were originally indicted with Petit Frere – Jeffrey Pierre, Daruco Pacouloute, Hassan Pacouloute ("Hassan"), and Chantal Tejada – pled guilty, pursuant to written plea agreements. In Hassan's plea agreement, he agreed to "provide truthful and complete information and testimony . . . ." In

2

exchange, the government agreed that it would recommend a sentencing reduction for acceptance of responsibility and would consider filing a motion for a downward departure based on his substantial assistance. After pleading guilty on May 9, 2008, Hassan notified the court through his attorney that, if he was called by Petit Frere as a witness at her trial, he would invoke his right to remain silent.

Petit Frere then filed a pre-trial motion to dismiss the indictment, arguing that the government violated her due process rights by intimidating Hassan into not testifying on her behalf. Petit Frere's argument was premised on the following e-mail, which had been sent by the prosecutor to Hassan's attorney:

> It is my understanding that Juliette Petit Frere intends to call your client as a witness at trial.
>
> I wanted to let you and [Petit Frere's attorney] know that [the] United States intends to ask the Court to instruct Hassan Pacouloute as to his Fifth Amendment rights.
>
> You should know that, in additional [sic] to further criminal prosecution, your client could face adverse consequences for providing untruthful testimony at trial. The plea agreement specifically requires his truthful cooperation and any possible 5K or other benefits (e.g. acceptance of responsibility) that he is entitled to under the plea agreement could be lost.

Petit Frere's argument was also premised on her belief that Hassan would have testified that Petit Frere was not involved in the conspiracy. For support, she attached a May 27, 2008, report prepared by U.S. Secret Service Agent Michael

3

Moore, which memorialized Hassan's account of the conspiracy. According to the report, Hassan had worked as a waiter at the Tap Tap Haitian Restaurant with Tejada, a good friend of his, and Petit Frere, his girlfriend of five years. After Hassan quit his job there, he and his brother Daruco accepted a proposal from Pierre to steal credit card numbers using an electronic skimming device. Hassan recruited Tejada to steal her customers' credit card information, but Tejada apparently did not use the skimming device correctly. As a result, Hassan decided to use the device himself, which he did at Tap Tap on three to four days in December 2007. Significantly, Hassan stated that he covertly skimmed Petit Frere's customer's credit cards without her knowledge. At the same time, however, Hassan was also quoted in the report as stating that Petit Frere once told him to "take it easy with" the skimming device.

The district court ultimately entered an order denying the motion as follows:

[T]he undersigned finds that the Government's e-mail in this case – which was sent to Hassan's counsel, did not involve direct contact with Hassan himself, and which, by its plain terms, merely apprised counsel that his client "could" face additional criminal prosecution and other adverse consequences for providing untruthful testimony at trial – does not rise to the level of "substantial interference" with Hassan's free and unhampered choice to testify such that Defendant's due process rights have been violated. In addition, despite Defendant's categorization of the e-mail as a "threat," given the language used in the communication and the fact that the e-mail was sent to counsel, the Court fails to see the vice in the Government's conduct, especially because a prosecutor is always entitled to attempt

4

to avert perjury and to punish criminal conduct.

In addition to confirming the general contours of the conspiracy as set forth in Hassan's May 27, 2008, statement to Agent Moore, the following testimony was elicited at trial. The government called Gary Sanon Jules, the manager of Tap Tap, who testified that Petit Frere worked from December 12-15, 2007, but neither Tejada nor Hassan were employed at that time. Although Hassan was not an employee, Jules testified that, in December 2007, Hassan came into Tap Tap once or twice a week around closing time and helped Petit Frere "bring the tables in." Jules never saw Hassan take credit cards or checks from any customers and, if he had seen this, he would have challenged both Hassan and Petit Frere about it, as Hassan was "not working there" and "ha[d] no business" doing that.

The government called Agent Moore, the lead investigator in the case, who testified that "[t]here were 15 names on the credit card device and when I tracked back their histories, they were used at Tap Tap and the defendant was the server that processed all the transactions," which occurred from December 12-15, 2007. Moore also testified that he had met with Hassan on at least four occasions, but the only time that Hassan told him that he personally skimmed the credit cards at Tap Tap was at the May 27, 2008, meeting. Prior to that meeting, Hassan had given statements that were inconsistent with this admission.

5

The government called Benikia Taylor, who testified that she, her boyfriend, and another couple had dinner at Tap Tap during the second week of December 2007. She testified that Petit Frere was their server and, at the end of the meal, Taylor's boyfriend and the other gentleman split the bill, each putting down a credit card. After Petit Frere personally took the credit cards inside for processing, Taylor testified that they "noticed [that] it was taking a long time for her to bring back the bill so we could sign it and go. We were wondering what the problem was. So we were kind of concerned about why it was taking so long." Eventually, Petit Frere returned with the credit cards, but the two men noticed that there was "some sort of issue" with the bill, which they ultimately had to straighten out with Petit Frere. Some time later, Taylor's boyfriend was informed that several unauthorized charges were being made on his credit card.

After the court denied the defense's motion for a judgment of acquittal, Petit Frere testified on her own behalf that she did not personally skim any credit cards at Tap Tap and had no knowledge that Hassan, who was her boyfriend of five years, was doing so. She also testified that Hassan would sometimes come to Tap Tap for her entire shift, which lasted six to seven hours, and help her clean tables and pick up her customers' checks. Petit Frere did not remember whether Hassan did this from December 12-15, 2007.

After the court denied Petit Frere's renewed motion for a judgment of acquittal and the parties presented their closing arguments, the court brought Hassan in to testify out of the jury's presence in connection with the defense's request for a missing-witness jury instruction. Hassan confirmed that his attorney had previously shown him the government's e-mail, and he was aware that his attorney thereafter filed a notification invoking Hassan's right to remain silent. Hassan also testified that he was willing to testify on behalf of either the government or Petit-Frere, but he would not do so without his attorney, who was out of town on his honeymoon. As a result, the court ultimately ruled that Hassan was unavailable as a witness, and he did not testify in front of the jury.

The jury thereafter returned a verdict, finding Petit Frere guilty of the conspiracy count but not guilty of the five substantive counts. Petit Frere subsequently filed a motion for a judgment of acquittal or, in the alternative, a motion for a new trial, in which she, inter alia, essentially repeated her motion to dismiss the indictment and argued that the evidence was insufficient to sustain her conviction. The district court denied the motion. The court ultimately sentenced Petite Frere to five months' imprisonment.

## II.

"We review the district court's denial of a motion for new trial for abuse of

7

discretion." United States v. Sweat, 555 F.3d 1364, 1367 (11th Cir. 2009). We

also review the denial of a motion to dismiss the indictment for abuse of discretion,

"but underlying legal errors, including due process claims, are reviewed de novo."

United States v. Robison, 505 F.3d 1208, 1225 n.24 (11th Cir. 2007), cert. denied,

129 S.Ct. 627 (2009).

"The Supreme Court has recognized that a criminal defendant has a

constitutional right to 'present [her] own witnesses to establish a defense.'"[1]

United States v. Terzado-Madruga, 897 F.2d 1099, 1108 (11th Cir. 1990) (quoting

Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019

(1967)). "Substantial interference with a defense witness's free and unhampered

choice to testify violates [the] due process rights of the defendant. When such a

violation of due process rights occurs, a court must reverse the conviction without

regard to prejudice to the defendant." Demps v. Wainwright, 805 F.2d 1426, 1433

(11th Cir. 1986) (citations omitted).

For purposes of this appeal, the seminal illustration of substantial

interference with a defense witness's decision to testify comes from the Supreme

Court's decision in Webb v. Texas, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330

---

[1] The defendant's right to present witnesses is specifically found in the Sixth Amendment's right to compulsory process, but after this right was incorporated in the Due Process Clause of the Fourteenth Amendment, the case law "ha[s] been based on due process rights without reference to the [S]ixth [A]mendment." United States v. Hammond, 598 F.2d 1008, 1012 n.3 (5th Cir. 1979).

8

(1972).  In that case, the Supreme Court held that the defendant's due process

rights were violated under the following circumstances:

> The trial judge gratuitously singled out [a defense] witness for a
> lengthy admonition on the dangers of perjury.  But the judge did not
> stop at warning the witness of his right to refuse to testify and of the
> necessity to tell the truth.  Instead, the judge implied that he expected
> [the witness] to lie, and went on to assure him that if he lied, he would
> be prosecuted and probably convicted for perjury, that the sentence
> for that conviction would be added on to his present sentence, and that
> the result would be to impair his chances for parole. . . . [I]n light of
> the great disparity between the posture of the presiding judge and that
> of a witness in these circumstances, the unnecessarily strong terms
> used by the judge could well have exerted such duress on the witness'
> mind as to preclude him from making a free and voluntary choice
> whether or not to testify.

Id. at 97-98, 93 S.Ct. at 353 (footnote omitted).

In this case, Petit Frere contends that the government's e-mail to Hassan's

attorney violated her due process rights because, like the trial judge's comments in

Webb, it substantially interfered with Hassan's decision of whether to testify on

her behalf.  To reiterate, the e-mail at issue informed Hassan's attorney that the

government would ask the court to instruct Hassan on his Fifth Amendment rights

if he took the stand and that, if Hassan testified untruthfully, he could face further

prosecution and lose certain sentencing benefits to which he was entitled under the

plea agreement.  As a result, Hassan conferred with his attorney and notified the

court that he was invoking his right to remain silent.  See United States v. Cuthel,

9

903 F.2d 1381, 1384 (11th Cir. 1990) ("While there is arguably a conflict between a witness's fifth amendment privilege and a defendant's sixth amendment right to compulsory process, such conflict long ago was resolved in favor of the witness's right to silence.").

However, we conclude that the government's e-mail did not violate Petit Frere's due process rights for several reasons. First, it is well-established under our case law that the government was permitted to inform Hassan's attorney that his client could be prosecuted if he testified untruthfully. See United States v. Nunn, 525 F.2d 958, 960 & n.3 (5th Cir. 1976) (holding that there was no due process violation under Webb where the trial judge "read and explained in detail the perjury laws, after which the witness changed his testimony"); United States v. Gloria, 494 F.2d 477, 484 (5th Cir. 1974) (same, where the witness "was merely advised of the possibility of prosecution if his testimony materially differed from his prior plea, not that he would be prosecuted if he testified"); Griffin v. Weinberger, 492 F.2d 969, 970 (5th Cir. 1974) (same, in the social security context, where "the [administrative law judge's] admonition did no more than lay out accurately the consequences of testifying falsely").[2]

_____

[2] Upon the creation of this Circuit, we adopted as binding precedent all decisions of the former Fifth Circuit announced prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

In this respect, the government no more violated Petit Frere's due process rights by accurately reminding Hassan's attorney that his client was bound under the plea agreement to provide truthful information and that, if he testified falsely, he could lose certain sentencing benefits to which he was entitled under the plea agreement. Nor did the plea agreement itself substantially interfere with Hassan's decision whether to testify. See Terzado-Madruga, 897 F.2d at 1108-09 (holding that there was no due process violation where the plea agreement required the defense witness to provide truthful testimony); cf. United States v. Henricksen, 564 F.2d 197, 198 (5th Cir. 1977) (holding that the defendant's due process rights were violated because the plea agreement prohibited a defense witness from testifying "in any manner" regarding the defendant).

Significantly, the government's e-mail was also not impermissibly threatening or coercive. Unlike the judge's comments in Webb, the e-mail did not contain a "lengthy admonition of the dangers of perjury," did not "assure [Hassan] that if he lied, he would be prosecuted and probably convicted for perjury," and did not use "unnecessarily strong terms" to convey its message. See Webb, 409 U.S. at 97-98, 93 S.Ct. at 353. Instead, as discussed above, the e-mail did no more than briefly and mildly remind Hassan's attorney of what could happen if his client testified untruthfully.

11

The non-threatening nature of the e-mail is further illustrated by contrasting it to the conduct that this Court has found to violate a defendant's right to due process. See United States v. Heller, 830 F.2d 150, 152 (11th Cir. 1987) (holding that the defendant's due process rights were violated where IRS agents admittedly coerced the defendant's accountant to provide false testimony by informing him that, unless he testified, he would become a defendant himself); Hammond, 598 F.2d at 1012-13 (same, where an FBI agent, during a court recess, told the defense witness that if he continued with his testimony, he would have "nothing but trouble" at his own, separate trial).[3]

Petit Frere's contention that the e-mail constituted a threat is also undermined by the fact that it was sent to Hassan's attorney, not Hassan himself. See United States v. Stuart, 507 F.3d 391, 399 (6th Cir. 2007) ("[C]ounsel even admitted that the prosecution never directly threatened these witnesses, stating that she herself relayed that the government would prosecute them for perjury.")

---

[3] The same picture emerges when contrasting the government's e-mail with two widely-cited cases from other circuits. See United States v. Morrison, 535 F.2d 233 (3d Cir. 1976) (holding that the defendant's due process rights were violated where the prosecutor repeatedly warned the defense witness of her liability to prosecution, which "culminated in a highly intimidating personal interview" made possible by a legally invalid subpoena); United States v. Thomas, 488 F.2d 334 (6th Cir. 1973) (same, where a secret service agent approached the defense witness and informed him that he would be prosecuted for misprision of a felony if he testified, despite the fact that the court and counsel for the defendant had previously "went to considerable lengths to advise" the witness of the dangers of testifying).

(quotation and alteration omitted); United States v. Viera, 839 F.2d 1113, 1115 (5th Cir. 1988) (en banc) ("[T]he prosecutor cannot be charged with harassment, particularly when the statement was made to defense counsel rather than to a prospective lay witness . . . ."). Thus, despite the fact that the government's e-mail led to Hassan's decision not to testify, that decision was ultimately his own, made freely after consulting with his attorney.

Finally, the record supports the government's position that, based on Hassan's inconsistent pre-trial statements, it had reason to believe that he would in fact testify untruthfully. See Viera, 839 F.2d at 1115 ("A prosecutor is always entitled to attempt to avert perjury . . . ."). First, in Agent Moore's May 27, 2008, report, which Petit Frere attached to her motion to dismiss, Hassan stated both that Petit Frere had no knowledge that he was skimming credit cards and that she once told him to "take it easy" with the skimming device. Second, Agent Moore testified at trial that, before Hassan's statement on May 27, 2008, he had repeatedly denied skimming any credit cards at all. Finally, in his objections to the PSI, Hassan stated that Petit Frere "may have been aware" that he was skimming credit cards. Based on these materially inconsistent statements, the government had a reasonable basis to question whether Hassan would testify truthfully, thus further undermining Petit Frere's argument. See United States v. Whittington, 783 F.2d

13

1210, 1219 (5th Cir. 1986) ("The government simply told [the defense witness] that it believed he had already given false statements to government agents and that, if he repeated those statements under oath at trial, they would support an indictment for perjury. We do not feel that this was governmental interference in violation of the defendants' due process rights.").

In sum, we conclude that the government's e-mail did not substantially interfere with Hassan's decision whether to testify and, therefore, did not violate Petit Frere's due process rights.

**III.**

We review the denial of a defendant's motion for a judgment of acquittal de novo, "viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in favor of the jury's verdict." United States v. Hunt, 526 F.3d 739, 744 (11th Cir. 2008). In conducting this review, "[w]e must determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." United States v. Mercer, 541 F.3d 1070, 1074 (11th Cir. 2008). Thus, "our sufficiency review requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented," as "the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Woodard, 531 F.3d 1352, 1360 (11th

14

Cir. 2008) (quotations omitted).

Petit Frere disputes a critical aspect of the above standard of review, arguing that, because the jury returned an inconsistent verdict – and it is unclear which party benefitted from that verdict – we should conduct a "neutral" review of the facts instead of viewing them in the light most favorable to the government.[4] Petit Frere relies on the Supreme Court's decision in United States v. Powell, which does support the proposition that it is unclear which party benefits when a jury renders an inconsistent verdict. See 469 U.S. 57, 65, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) ("Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored."). However, the consequence of this proposition is simply that Petit Frere receives "the benefit of her acquittal on the counts on which she was acquitted" and "accept[s] the burden of conviction on the count[] on which the jury convicted." Id. at 69, 105 S.Ct. at 479. Indeed, the Court in Powell rejected the suggestion that an inconsistent jury verdict affects our sufficiency review:

> Finally, we note that a criminal defendant already is afforded
> protection against jury irrationality or error by the independent review
> of the sufficiency of the evidence undertaken by the trial and appellate

---

[4] Petit Frere contends that the verdict was inconsistent because the jury found her guilty of the conspiracy count but not guilty of the underlying substantive counts.

15

courts. This review should not be confused with the problems caused by inconsistent verdicts. Sufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

Id. at 67, 105 S.Ct. at 478 (citations omitted). Thus, we have cited Powell for the proposition that "sufficiency-of-the-evidence review is separate from, and should not be confused with, problems caused by inconsistent verdicts." United States v. Church, 955 F.2d 688, 695 (11th Cir. 1992). Moreover, Powell makes clear that "further safeguards" against jury irrationality or error – such as, for example, Petit Frere's proposed "neutral" evaluation of the facts – are "unnecessary." 469 U.S. at 67, 105 S.Ct. at 478. Finally, we have previously applied the traditional sufficiency-of-the-evidence standard of review in cases where the defendant asserted that there was an inconsistent jury verdict. United States v. Veal, 153 F.3d 1233, 1252-53 (11th Cir. 1998); United States v. Lozano-Hernandez, 89 F.3d 785, 789 (11th Cir. 1996). Thus, even assuming arguendo that the jury returned an inconsistent verdict in this case, we conduct our traditional sufficiency review and view the facts in the light most favorable to the government.

Nonetheless, Petit Frere contends that, even applying such a standard, the

16

evidence was insufficient to support her conspiracy conviction. To obtain a conviction for conspiracy, "the government must have proven beyond a reasonable doubt, even if only by circumstantial evidence, that a conspiracy existed and that the defendant knowingly and voluntarily joined the conspiracy." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005). "Although mere presence at the scene of a crime is insufficient to support a conspiracy conviction, presence nonetheless is a probative factor which the jury may consider in determining whether a defendant was a knowing and intentional participant in a criminal scheme." Id. (quotation omitted). Indeed, a "conspiracy conviction will be upheld when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to [her]." United States v. Garcia, 447 F.3d 1327, 1338 (11th Cir. 2006) (quotation and alteration omitted).

Petit Frere concedes that there was a conspiracy to steal credit card information from Tap Tap customers, but she contends that there was no evidence establishing her awareness of, or participation in, that conspiracy. However, the government did introduce strong circumstantial evidence which, when viewed in the light most favorable to the government, could have allowed a reasonable jury to find that Petit Frere knowingly participated in the conspiracy. See United States v.

17

Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005) (stating that the government may use circumstantial evidence to prove that the defendant joined a conspiracy); United States v. Williams, 390 F.3d 1319, 1325 (11th Cir. 2005) ("This Court has previously held that circumstantial evidence may prove knowledge and intent."). Most importantly, the government established that 15 credit card numbers stored in the electronic skimming device belonged to customers who Petit Frere served on four consecutive days in December 2007.  In addition, Benikia Taylor, the girlfriend of one of the victims, testified that Petit Frere served her, her boyfriend, and another couple, personally picked up two credit cards from their table at the end of the meal, and took an unusually long time to process the cards.

Relying exclusively on her own testimony, Petit Frere's defense at trial was that Hassan was skimming the credit cards without her knowledge.  "However, the jury, hearing her words and seeing her demeanor, was entitled to disbelieve the Defendant's testimony and, in fact, to believe the opposite of what she said." Williams, 390 F.3d at 1326 (stating that this rule "applies with special force" where the defendant's intent or knowledge is at issue).  Furthermore, the jury could have also disbelieved Petit Frere's testimony because, even if Hassan was the one skimming her customers' credit cards, it was unlikely that Petit Frere would have been unaware of this fact, especially in light of the number of credit cards

18

involved. While Petit Frere testified that Hassan would come to Tap Tap for entire shifts at a time and help her pick up customers' checks, Taylor's testimony established that Petit Frere personally picked up at least two of the credit cards herself. Moreover, Jules, the manager at Tap Tap, testified that Hassan only came in once or twice a week at closing time – as opposed to several consecutive days for Petit Frere's entire shift – and never saw Hassan handle customers' checks.

The only other evidence introduced at trial supporting Petit Frere's defense was Hassan's May 27, 2008, statement to Agent Moore, in which he admitted skimming the credit cards without Petit Frere's knowledge. However, Agent Moore testified that this statement – which, notably, was made after Hassan had already pled guilty – was inconsistent with Hassan's previous statements, where he denied skimming the credit cards.

In sum, the circumstantial evidence in this case was sufficient for a reasonable jury to conclude that Petit Frere participated in the conspiracy either by personally skimming her customers' credit cards or by providing Hassan access to those cards. Thus, we conclude that the evidence was sufficient to support her conviction.

**IV.**

Accordingly, we affirm Petit Frere's conviction.

19

**AFFIRMED.**