# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 7, 2011

No. 10-40347

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

ENITAN OSAGIE ISIWELE,

Defendant – Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, DeMOSS, and PRADO, Circuit Judges.

KING, Circuit Judge:

Defendant–Appellant Enitan Isiwele was convicted on multiple counts of health care fraud and conspiracy to pay kickbacks in connection with a scheme to fraudulently bill Medicare/Medicaid for power wheelchairs. In this appeal, Isiwele challenges the exclusion of certain prior inconsistent statements of witnesses at trial as well as various aspects of his sentence. We affirm the judgment of conviction. We vacate Isiwele's sentence; the district court correctly applied the "mass marketing" and "abuse of trust" sentencing enhancements, but the court's method for determining the "loss amount" attributable to the fraud requires clarification.

No. 10-40347

BACKGROUND

Appellant Enitan Isiwele was the owner of a durable medical equipment ("DME") supply company called Galaxy Medical Supply ("Galaxy"), which was a supplier to both Medicare and Medicaid.  DME includes power wheelchairs. Medicare rules relating to power wheelchairs provide that a beneficiary must first obtain a prescription from a physician who determines that the beneficiary cannot use a cane, walker, rollator, or manual wheelchair.  Upon submission of such a prescription to a DME supplier, the supplier must complete a Certificate of Medical Necessity, to be signed by the physician and then sent together with the prescription to Medicare. Medicare then reimburses the supplier for the power wheelchair.  Medicaid's procedures for DME reimbursement are similar to Medicare's.

In an effort to meet urgent medical needs in the wake of Hurricanes Katrina and Rita, Medicare eliminated these documentary requirements for the replacement of any power wheelchairs lost or damaged in those hurricanes. This waiver applied only to beneficiaries who had already met the requirements for a doctor's prescription and Certificate of Medical Necessity before obtaining their original power wheelchairs.  Galaxy used this waiver to bill Medicare and Medicaid a total of $587,382.65 for power wheelchairs and related accessories, and was reimbursed a total of $297,381.04.

Isiwele was tried on sixteen counts of health care fraud, in violation of 18 U.S.C. § 1347, and one count of conspiracy to pay illegal remunerations, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A).  The indictment alleged that Isiwele instructed a "recruiter," Linda Patterson, to go into elderly and low-income communities and gather billing information from Medicare/Medicaid beneficiaries.  Isiwele paid Patterson for this information, which he then used to claim reimbursement from Medicare/Medicaid under the new hurricane exception for power wheelchairs provided to these beneficiaries.  At trial, the

2

No. 10-40347

government presented testimony from Patterson, as well as from eleven such beneficiaries who testified that they did not need a power wheelchair and never had a power wheelchair prior to Hurricanes Katrina or Rita, much less one that was damaged in those hurricanes. The jury found Isiwele guilty on all counts.

At sentencing, the district court applied a fourteen-level increase to Isiwele's base offense level on the basis of the "loss amount" occasioned by Isiwele's fraud. The court calculated the loss amount according to the amount that Isiwele billed to Medicare/Medicaid. Isiwele objected, arguing that the proper loss amount was the total of the fixed allowances paid for the wheelchairs by Medicare/Medicaid. The district court also applied a two-level increase to Isiwele's offense level for the use of "mass marketing" in committing the offenses and another two-level increase for an "abuse of trust" based on Isiwele's status as a DME supplier to Medicare/Medicaid. Isiwele was sentenced to 97 months' imprisonment and three years of supervised release, and was ordered to pay a $1,700 special assessment and restitution in the amount of $201,397.34. He now appeals his conviction and sentence.

## ANALYSIS

### I.     Exclusion of Prior Inconsistent Statements

Isiwele claims that the district court erred in excluding three documents offered as prior inconsistent statements of three different witnesses. We review a district court's evidentiary rulings for abuse of discretion, subject to harmless error review. *United States v. Jackson*, 625 F.3d 875, 879 (5th Cir. 2010).

Federal Rule of Evidence 613 provides that a witness may be impeached with a prior inconsistent statement. *See United States v. Watkins*, 591 F.3d 780, 787 (5th Cir. 2009) ("It is well established that after a witness denies making a statement during cross examination, evidence may be introduced to prove the statement was made." (citations omitted)). However, Federal Rule of Evidence 901(a) requires, as a preliminary matter, that all evidence be properly

No. 10-40347

authenticated as a condition precedent to admission. The proponent bears the burden of introducing "evidence sufficient to support a finding that the matter in question is what its proponent claims." FED R. EVID. 901(a); *see* 5 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 901.02[3], at 901-14 (Joseph M. McLaughlin ed., 2d ed. 2010) [hereinafter "WEINSTEIN"]. "The requirement of showing authenticity falls in the category of 'relevancy dependent upon fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b).'" 5 WEINSTEIN § 901.02[3], at 901-15 (quoting FED. R. EVID. 901 Advisory Committee Note (1972)). "Under Rule 104(b), the trial court must admit the evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Id*.

The prior inconsistent statements at issue here are three documents, each entitled "Request for Replacement of DME Lost in Hurricane" and purportedly signed by one of three beneficiaries—Leroy Bass, Marion DeGutis, and James Brady—who were government witnesses at trial. The documents were on Galaxy letterhead and stated:

> I, [name of beneficiary/witness], hereby request the services of Galaxy Medical Supply, LLC to assist me in obtaining a replacement for my equipment, a(an) POWERCHAIR, which was lost in [H]urricane RITA.

> By signing the attached Release of Information and Authorization for Payment of Benefits Form, I hereby declare that the said equipment was lost as a direct result of the hurricane and authorize us [sic] to take necessary action to assist me in securing the replacement equipment.

On cross examination, each of the three witnesses identified his or her signature on one of these documents, but testified in direct contravention of its contents that they had not previously owned power wheelchairs that were lost in Hurricane Rita. Bass testified that he signed a paper that Isiwele gave him to sign, without looking at it. When shown the statement at trial, Bass said that

No. 10-40347

he did not know what the document was, that he did not know "how [his signature] got there," and surmised that "[i]t could have been under something else and I signed and you got my name under there." DeGutis testified that the signature on the document bearing her name looked like her signature, but said the contents of the documents were not true. Brady identified his signature, but stated at trial that he "didn't read the documents" and disagreed with the contents.[1] The district court refused to admit these documents into evidence on the ground that they had not been properly authenticated because the witnesses did not absolutely adopt the substance of the documents.

"[W]e do not require conclusive proof of authenticity before allowing the admission of disputed evidence." *Watkins*, 591 F.3d at 787. Rule 901(a) "merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." *Id*. "Once the proponent has made the requisite showing, the trial court should admit the exhibit . . . in spite of any issues the opponent has raised about flaws in the authentication. Such flaws go to the weight of the evidence instead of its admissibility." 5 WEINSTEIN § 901.02[3], at 901-17.

In *United States v. Whittington*, 783 F.2d 1210 (5th Cir. 1986), we held that "[p]roof that a document has been signed is sufficient to charge a signatory with its contents." *Id*. at 1215 (citing 7 J. WIGMORE, EVIDENCE § 2134, at 719 & n.2 (Chadbourn rev. 1978)). In *Whittington*, the defendants challenged a contract bearing their signatures on the grounds that there was no evidence that any part of the document other than the signature page was the same as the document they originally signed, and that they never intended the contract to have any legal effect. *Id*. at 1214–15. In holding that the document was

---

[1] It is unclear from the transcript whether Brady meant that he did not read the document while on the stand, or whether he did not read the document before he signed it.

sufficiently identified as authentic by identification of its signature page, we stated:

> A decision that a document is authentic and, therefore, admissible does not determine whether the evidence will be credited by the trier of fact. The opponent may then question whether the challenged document is the same or different from the one originally signed. As *Weinstein's Evidence* states, "Once the evidence is admitted the question becomes one of credibility and probative force and the trier may ultimately disbelieve the proponent's proof and entirely disregard or substantially discount the persuasive impact of the evidence admitted."

*Id*. at 1215 (quoting J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 901(a)[01], at 16–17 (1985)). After the district court admitted the contract on the basis of evidence sufficient to authenticate it—the defendants' signatures on the signature page—it became the separate role of the trier of fact to "make an ultimate determination of its genuineness, including whether the entire document was sufficiently identified as the one signed by [the defendants]." *Id*.; *see also Proctor v. Colonial Refrigerated Transp., Inc*., 494 F.2d 89, 93 (4th Cir. 1974) (holding that, "[w]ith the authenticity of the signature admitted, [a] statement was proper impeachment material" where a witness identified his signature on a statement but testified at trial that he could not remember giving the statement and denied certain portions of it).

The government argues that the single fact of the witnesses' signatures was insufficient to establish the authenticity of the documents, given the other circumstances relevant to their authenticity. The government points to the fact that the witnesses in question are elderly and/or mentally infirm; that Isiwele's co-defendant, the recruiter Linda Patterson, testified that she never saw such documents and that Isiwele was never concerned about whether beneficiaries

were replacing wheelchairs lost in a hurricane; and that the circumstances surrounding the discovery and production of the documents were suspicious.[2]

However, these arguments properly go to the weight of the evidence, not to its authenticity. Once the signatures were authenticated, the district court should have admitted the documents and allowed the government to present these arguments to the jury to show that the testimony of Bass, DeGutis, and Brady at trial should be believed rather than the impeaching statements they allegedly signed. *Accord Whittington*, 783 F.2d at 1215 ("The defendants had ample opportunity to challenge the identity of the remainder of the document, to show how it came to be signed (as they did, at length), and to urge that, although signed, it was not intended to have legal effect.").

Having concluded that the exclusion of the documents was an abuse of discretion, we turn now to whether this error was harmless beyond a reasonable doubt. *See Jackson*, 625 F.3d at 885. Notably, Isiwele argued below only that the documents should be admitted as prior inconsistent statements for the purpose of impeachment. Therefore, if the documents had been admitted, the jury could have considered them only for the purposes of impeachment of Bass, DeGutis, and Brady, not as evidence that those witnesses had lost power wheelchairs in Hurricanes Rita and that Medicare reimbursement for their wheelchairs was thus appropriate. *See Watkins*, 591 F.3d at 787.

Bass was eighty-three years old at the time of trial. He testified that in 2006, Isiwele phoned him and told him that he had won a wheelchair that would be delivered to Bass's home. When Isiwele arrived at Bass's home, he put the wheelchair together and gave him "some paper and told [Bass] to sign [his] name on it," which Bass did. Bass then put the wheelchair in storage. Bass testified that he did not need a wheelchair, nor did he want one. He further testified that

---

[2] The documents were provided to the government the morning of the trial with no explanation as to why they were not produced earlier.

he had not been affected by Hurricanes Katrina or Rita, and that he never asked anybody to replace a wheelchair damaged by those hurricanes. He also testified that it would be impossible to use a wheelchair on his property because he had no ramp or concrete sidewalks, his house was situated on a hill, and the wheelchair would not even fit through the doorway of his home.

Ninety-two-year-old Marion DeGutis testified that she did not need a power wheelchair and never had one previously. She was approached by a woman who asked her if she wanted a wheelchair. DeGutis, who used a cane, said no. Despite declining the offer, DeGutis received a wheelchair, which she never used. DeGutis did not recall signing any documents at the time the wheelchair was delivered, and noted that the signature on the delivery notice was not in her handwriting and that her name had been misspelled.

James Brady was a man suffering from slight mental retardation and severe diabetes. Nevertheless, he was ambulatory and testified that he did not need a wheelchair and had never had a power wheelchair before. He testified that he just "went along with the group" of his neighbors who all received power wheelchairs.

The circumstances under which the documents were allegedly signed—including the advanced age of these witnesses and Brady's slight mental retardation—raise the inference that the declarants were misled or confused about what they were signing, and/or did not read the statements before signing them. The impeaching statements would also have been weighed against the clear and adamant testimony of these witnesses at trial that they neither needed nor ever had power wheelchairs, testimony that was repeated by all the other beneficiaries in the case.

The jury also heard corroborating testimony from Linda Patterson, the recruiter, who testified that she could not recall ever seeing any kind of form like the documents in question, that she had never asked beneficiaries if they were

replacing wheelchairs damaged or lost in a hurricane, and that Isiwele never seemed concerned about whether the beneficiaries were replacing DME lost in a hurricane. This testimony was significant in light of the fact that all of the beneficiaries testified that they were approached by a lone woman (some of them remembered her name as "Linda"), and that Isiwele had not been the person who recruited them for receiving power wheelchairs or gathered their Medicare/Medicaid information.

Based on the evidence described above, we conclude that even if the documents had been admitted, the jury would have found beyond a reasonable doubt that Isiwele was guilty of filing fraudulent claims for reimbursement of power wheelchairs for Bass, DeGutis, and Brady. The error in excluding the forms was therefore harmless.

## II.   Calculation of Loss Amount

The amount of loss resulting from the fraud is a specific offense characteristic that increases the base offense level under the U.S. Sentencing Guidelines. U.S.S.G. § 2B1.1(b)(1) (2010). "Loss" is defined in the commentary to § 2B1.1 as "the greater of actual loss or intended loss." *Id.* cmt. n.3(A). "Intended loss" includes "intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* cmt. n.3(A)(ii). We review de novo the district court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate. *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010).

The district court determined the loss amount in this case to be $587,382.65. In making this determination, the district court measured the amount of intended loss by the amount that Isiwele billed to Medicare/Medicaid, rather than the lower amount that Medicare/Medicaid allowed and paid for the

wheelchairs.  On appeal, Isiwele challenges this method as overstating the loss amount because Medicare/Medicaid has a fixed fee schedule for DME and does not reimburse a supplier for any amount billed over those fixed allowances.  He alleges that he knew he would receive these lower capped amounts, and that he therefore did not have the subjective intent to cause a loss equal to the amount he billed.

Our cases have endorsed a fact-specific, case-by-case inquiry into the defendant's intent in determining "intended loss" for sentencing purposes.  "Although it may be theoretically possible to intend a loss that is greater than the potential actual loss, our case law requires the government [to] prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level."  *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003).  We now explicitly apply this standard to the health care fraud context, adopting the approach taken by the Fourth Circuit in *United States v. Miller*, 316 F.3d 495 (4th Cir. 2003): the amount fraudulently billed to Medicare/Medicaid is "prima facie evidence of the amount of loss [the defendant] intended to cause," but "the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent."  *Id.* at 504; *see also United States v. Hearne*, Nos. 09-60613, 09-60750, 2010 WL 4116663, at *1–2 (5th Cir. Oct. 20, 2010) (considering evidence that the defendant lacked knowledge of the billing procedures for Medicare and therefore did not understand the amounts that Medicare likely would pay); *United States v. Singh*, 390 F.3d 168, 193–94 (2d Cir. 2004) (remanding for resentencing in order to give the defendant an opportunity to show that the total amount he expected to receive was less than the amount he actually billed to Medicare/Medicaid).

A close reading of the record below leaves us uncertain as to what the district court understood the law to be.[3]  There is some evidence in the record on the basis of which the court could have concluded that Isiwele intended to receive only the lower capped amount.[4]  However, the determination of the factual predicate for Isiwele's sentence is best made by the district court in the first instance.  We remand for resentencing on this issue consistent with the standard set forth above.  The district court may take additional evidence if it deems it necessary.

### III.    Mass Marketing Enhancement

U.S.S.G. § 2B1.1(b)(2)(A)(ii) provides for a two-level enhancement "[i]f the offense . . . was committed through mass-marketing."  The commentary to § 2B1.1 defines "mass-marketing" as "a plan, program, promotion, or campaign that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services; (ii) participate in a contest or sweepstakes; or (iii) invest for financial profit."  *Id.* cmt. n.4(A). Mass marketing is not limited to the mass communication methods listed in the commentary; the definition "explicitly contemplates 'other means' of mass-marketing."  *United States v. Magnuson*, 307 F.3d 333, 335 (5th Cir.

---

[3] Our uncertainty is exacerbated by the fact that the government cited two inapposite cases to the district court during the sentencing proceeding in support of its position that the intended loss amount should be measured by the higher billed amount.  *See United States v. McLemore*, 200 F. App'x 342, 344 n.1 (5th Cir. 2006) (specifically noting that the defendant in that case abandoned this issue on appeal); *United States v. Brown*, 354 F. App'x 216 (5th Cir. 2009) (never explicitly mentioning this issue at all).  Furthermore, in discussing Isiwele's objection to the calculation of the loss amount, the Presentence Investigation Report focused on the inapposite Guidelines comment that "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," U.S.S.G. 2B1.1 cmt. n.3(B), without actually addressing Isiwele's intent in this case.

[4] For example, Stephen Ward, a witness for the government, testified during the trial that "[w]hen you agree to participate in the Medicare program and provide services, you're agreeing to a set fee schedule for whatever the services are that you're providing."  The record reflects that Isiwele was a Medicare and Medicaid supplier.

2002) (per curiam). Among these "other means" of mass marketing is face-to-face marketing intended to reach a large number of persons. *See United States v. Jackson*, 220 F. App'x 317, 331–32 (5th Cir. 2007).

On appeal, Isiwele argues that a mass marketing enhancement should not apply because his mass marketing efforts were not directed at the victims of the crime—here, Medicare/Medicaid. This ground for objection is different from that which Isiwele raised during the sentencing hearing; consequently, the plain error standard of review applies. *See United States v. Medina–Anicacio*, 325 F.3d 638, 643 (5th Cir. 2003). Under plain error review, the appellant must show that there was a clear and obvious error that affected his substantial rights. *United States v. Andina–Ortega*, 608 F.3d 305, 309 (5th Cir. 2010). If these conditions are met, the court may exercise its discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (citation and internal quotation marks omitted).

Isiwele relies on an Eighth Circuit opinion, *United States v. Miller*, 588 F.3d 560 (8th Cir. 2009), in support of his argument that the mass marketing enhancement does not apply when the marketing is not directed at the victims. In *Miller*, the defendant was convicted of various offenses related to defrauding financial institutions through a mortgage fraud scheme. *Id.* at 562–63. The defendant used television commercials to recruit borrowers to apply for mortgages, which the defendant then sold to lenders by misrepresenting the borrowers' qualifications and property values. *Id.* at 562–63. The Eighth Circuit found no error in the district court's conclusion that the enhancement did not apply because "[t]he crime was the fraud that was committed on the lenders" and "there was no[] mass marketing involved in that . . . ." *Id.* at 568 (alteration original).

We find more persuasive our own recent decision in *United States v. Mauskar*, 557 F.3d 219 (5th Cir. 2009), in which we upheld the application of the

mass marketing enhancement to a physician who conspired to defraud Medicare/Medicaid by falsely certifying that ambulatory patients needed power wheelchairs. In *Mauskar*, "recruiters" targeted elderly beneficiaries to escort to the defendant's clinic for evaluations, and DME suppliers used the false Certificates of Medical Necessity supplied by the defendant to obtain payment from Medicare/Medicaid for medically unnecessary wheelchairs for thousands of beneficiaries. *Id*. at 224. The defendant objected to the mass marketing enhancement on the grounds that there was no evidence that he was personally involved in the mass marketing. *Id*. at 232–33.

While this argument is different from Isiwele's argument on appeal that the mass marketing was not directed at the victims of the fraud, the reasoning in *Mauskar* is instructive in upholding the enhancement here:

> The plain language of the Guidelines forecloses Mauskar's argument that the mass-marketing enhancement does not apply to his conduct. The mass-marketing enhancement is applicable if an "offense . . . was committed through mass-marketing." U.S.S.G. § 2B1.1(b)(2)(A)(ii). " 'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(H). And "in the case of a jointly undertaken criminal activity," relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

*Id*. at 233 (alteration original).

Implicit in the *Mauskar* court's holding is the determination that the mass marketing efforts of the recruiters who escorted beneficiaries to the defendant's medical clinic was "relevant conduct" constituting part of the "offense" of health care fraud, such that the mass marketing enhancement applied to the recruiters' co-defendant. We explicitly adopt that reasoning today in holding that the district court did not err in finding Isiwele eligible for the mass marketing

enhancement on the basis of Patterson's face-to-face recruitment of Medicare/Medicaid beneficiaries.

## IV.   "Abuse of Trust" Enhancement

Pursuant to clear Fifth Circuit precedent, the district court applied a two-level "abuse of trust" enhancement to Isiwele's offense level under U.S.S.G. § 3B1.3 because Isiwele's status as a DME supplier placed him in a relationship of trust with Medicare/Medicaid. *See United States v. Miller*, 607 F.3d 144, 148–50 (5th Cir. 2010). Isiwele argues that he was not in a relationship of trust with Medicare/Medicaid solely to preserve the argument for further review. We therefore summarily affirm this enhancement.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of conviction of the district court. We VACATE Isiwele's sentence and REMAND for resentencing as to the loss amount.