# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 13, 2012

No. 10-11077

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

MUHAMMED NASIRU USMAN, also known as Nasir Usman,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:09-cr-146-P-1

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Muhammed Nasiru Usman appeals his sentence for Medicare/Medicaid fraud, challenging the district court's calculation of loss amount under U.S.S.G. § 2B1.1 and application of enhancements for mass-marketing and abuse of a position of trust with Medicare and Medicaid. Usman also argues that his sentence is substantively unreasonable. We affirm.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-11077

## I.

Muhammed Nasiru Usman owned and operated two private ambulance companies, Royal Ambulance Services, Inc. ("Royal") and First Choice, EMS, Inc. ("First Choice"). Usman operated Royal until late 2006, when it ceased doing business due to seizure of its assets stemming from the investigation of its fraudulent Medicare and Medicaid billing. First Choice stopped doing business in 2007 after Medicare began denying its claims on pre-pay medical review.

Usman was indicted on one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 371; twelve counts of health care fraud, in violation of 18 U.S.C. §§ 1347 and 2; and one count of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2. David McNac, Usman's former office manager, and Shaun Outen, Usman's former director of operations, were also indicted and pled guilty to conspiracy to commit health care fraud. McNac's and Outen's plea agreements effectively limited their sentencing exposure to sixty months imprisonment – the statutory maximum for the conspiracy count.

Usman proceeded to trial. The evidence adduced at trial revealed that Royal and First Choice primarily transported Medicare and Medicaid patients to and from dialysis treatment on a non-emergency basis. Medicare paid for a non-emergency transport of a dialysis patient only if the patient suffered from a medical condition that, at the time of transport, made other means of transportation dangerous to the patient's health. At least eighteen patients transported by Royal and First Choice did not meet Medicare's criteria for reimbursement. In total, First Choice and Royal billed Medicare and Medicaid $3,644,464.90 for the eighteen patients. Under Usman's direction and approval, McNac, Outen, and other managers instructed company employees to modify the ambulance "runsheet" narratives to disguise the patients' true conditions. The claims for these patients omitted key details of the patients' medical statuses and transport and included false information to justify reimbursement.

The jury convicted Usman on all counts.

At sentencing, the district court applied an eighteen-level enhancement to Usman's base offense level based on a "loss amount" of $3,644,464.90.[1] The district court calculated the loss amount according to the amount Usman billed to Medicare/Medicaid. The district court also applied a two-level enhancement for mass-marketing,[2] a two-level enhancement for abuse of a position of trust,[3] a four-level adjustment for Usman's role as an organizer or leader in the criminal activity,[4] and a two-level increase in the offense level for obstruction of justice.[5] This resulted in a total offense level of 35. Because Usman was in Criminal History Category III, that offense level corresponded to a Guideline range of 210 to 262 months. However, the district court granted a two-level downward variance, leaving Usman with a Guideline range of 168 to 210 months. The court sentenced Usman to 180 months imprisonment and a three-year term of supervised release and ordered him to pay restitution in the amount of $1,317,179.30. Usman timely appealed.

## II.

### A.    Loss Amount

"We review de novo the district court's method of determining loss, while clear error review applies to the background factual findings that determine whether or not a particular method is appropriate."[6] The commentary to § 2B1.1 indicates that for the purposes of that Guideline, "loss" is the "greater of the

---

[1] *See* U.S.S.G. § 2B1.1(b)(1)(J).

[2] *See id.* § 2B1.1(b)(2)(A)(ii).

[3] *See id.*  § 3B1.3.

[4] *See id.* § 3B1.1(a).

[5] *See id.* § 3C1.1.

[6] *United States v. Isiwele*, 635 F.3d 196, 202 (5th Cir. 2011) (citing *United States v. Harris*, 597 F.3d 242, 251 n.9 (5th Cir. 2010)).

actual loss or intended loss."[7] To establish a particular amount of "intended loss," the government must prove by a preponderance of evidence that the defendant had the subjective intent to cause that amount of loss.[8] The commentary to § 2B1.1 explains that intended loss may "include[] intended pecuniary harm that would have been impossible or unlikely to occur."[9] This court has held that the amount fraudulently billed to Medicare and Medicaid is "prima facie evidence of the amount of loss [the defendant] intended to cause," but "the amount billed does not constitute conclusive evidence of intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent."[10]

Here, it was undisputed that Usman billed $3,644,464.90 in fraudulent claims. Thus, there was prima facie evidence that Usman intended a loss of $3,644,464.90.[11] Usman maintains, as he did at sentencing, that the district court should have found that he intended a loss of no more than the $1,317,179.30 actually paid on the fraudulent claims. Usman notes that he argued at sentencing that he and the others involved in the scheme were "abundantly aware" that they would only receive amounts allowed under Medicare's reimbursement formula and fee schedule. But Usman presented no evidence in support of that argument, and the record does not support it.

None of the witnesses at trial testified that Usman knew the details of Medicare's reimbursement formula and fee schedule. In addition, there was no testimony that Usman knew that Medicare would automatically forward the

---

[7] U.S.S.G. § 2B1.1 cmt. n.3(A). The commentary to a Guideline is binding unless it is inconsistent with the language of the Guideline. *See United States v. Cervantes-Blanco*, 504 F.3d 576, 579 n.1 (5th Cir. 2007).

[8] *United States v. Sanders*, 343 F.3d 511, 527 (5th Cir. 2003).

[9] U.S.S.G. § 2B1.1 cmt. n.3(A)(ii).

[10] *Isiwele*, 635 F.3d at 203.

[11] *See id.*

claims to Medicaid for dually-covered patients. Usman himself testified that he did not know the rules of Medicare/Medicaid billing or how to go about billing for ambulance transports. He stated that he contracted with professional billing companies "because they know the Medicare/Medicaid rules," which he did not know. Usman also testified that, although he owned and operated First Choice and Royal, he relied on his employees and was not aware of fraudulent conduct. One of the government's witnesses, an employee of a government contractor that processed Medicare claims, provided brief testimony about Medicare fee schedules and reimbursement rates, and the government introduced into evidence a disk containing a scanned version of the manual of Medicare rules and regulations for the years 2002 and 2004-2006. However, none of the billing representatives testified that they had discussed the reimbursement rates or fee schedules with Usman.

Given Usman's own testimony that he knew nothing about billing and the absence of any testimony that he was aware of or understood the Medicare fee schedule and reimbursement formula, it was not clear error for the district court to find an intended loss of $3,644,464.90 – the amount billed for fraudulent claims.[12]

## B.    Mass-Marketing Enhancement

We review the district court's factual findings with regard to the mass-marketing enhancement for clear error and the district court's interpretation of the Sentencing Guidelines de novo.[13]

The commentary to § 2B1.1(b)(2) explains that for the purposes of the subsection, "'mass-marketing' means a plan, program, promotion, or campaign

---

[12] *See, e.g.*, *United States v. Hearne*, 397 F. App'x 948, 951 (5th Cir. 2010) (unpublished) (finding no clear error in the district court's finding that the billed amount was the intended loss amount where "[t]here was evidence that [the defendant] lacked knowledge of the billing procedures for Medicare and therefore did not understand the amounts that Medicare likely would pay").

[13] *United States v. Mauskar*, 557 F.3d 219, 232 (5th Cir. 2009).

that is conducted through solicitation by telephone, mail, the Internet, or other means to induce a large number of persons to (i) purchase goods or services . . . ."[14] We have emphasized that "th[is] definition of 'mass-marketing' is not limited to the listed mediums-it explicitly contemplates 'other means' of mass-marketing."[15] For example, "face-to-face marketing intended to reach a large number of persons for the purpose of facilitating health care fraud can constitute mass-marketing."[16] For purposes of the enhancement, the mass-marketing need not be directed at victims of the fraud.[17] In addition, the enhancement may be applied even where the defendant did not actively participate in the mass-marketing activities.[18]

The district court explained that it was applying the mass-marketing enhancement in Usman's case because "[t]his Circuit has upheld that [enhancement] in . . . Medicare fraud cases where they are targeting nursing homes and the places where you have multiple people that could be potential clients." Usman argues that the district court erred in applying the enhancement because, unlike printed advertisements, promotional pens and mouse pads distributed by McNac and Outen merely displayed logos and did not "impart details . . . about the goods or services a company produces." As the government notes, however, the marketing efforts in this case consisted of more than the distribution of pens and mouse pads. Usman's employees distributed those promotional items, as well as "gifts provided by . . . Usman such as colognes, perfumes, [and] gift cards," in conjunction with a face-to-face marketing campaign that targeted administrators at nursing homes in the

---

[14] U.S.S.G. § 2B1.1 cmt. n.4.

[15] *United States v. Magnuson*, 307 F.3d 333, 335 (5th Cir. 2002) (per curiam).

[16] *Mauskar*, 557 F.3d at 233 (quotation marks, alterations, and citation omitted).

[17] *Isiwele*, 635 F.3d at 204-05.

[18] *Mauskar*, 557 F.3d at 233.

Dallas area. They also catered lunches for employees at the facilities. Usman and McNac enlisted Murray Thomas, one of the patients, to market for Usman at the dialysis center where she received treatment. McNac testified that in late 2004 and 2005, ninety percent of the patients served by Royal Ambulance had been "acquired by marketing efforts." The district court did not err in its application of the mass-marketing enhancement.

## C.    Abuse-of-Position-of-Trust Enhancement

Usman next challenges the district court's application of an enhancement based on Usman's abuse of a position of trust with Medicare and Medicaid,[19] arguing that as the owner of an ambulance service provider, he was not in a trust relationship with Medicare and Medicaid. As Usman acknowledges, that argument is barred by circuit precedent,[20] and he raises it merely to preserve it for future review.

## D.    Substantive Reasonableness

Usman asks the panel to find that his sentence was substantively unreasonable because it was "at least 300% higher than those meted out to his codefendants." Because Usman did not challenge the reasonableness of his sentence in the district court, we apply a plain error standard of review.[21] Under that standard, Usman must demonstrate that the district court made a clear or obvious error that affected his substantial rights.[22] If he does so, we may exercise our discretion to correct the error only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings.[23]

---

[19] U.S.S.G. § 3B1.3 (providing for a two-level enhancement "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense").

[20] *See United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010).

[21] *United States v. Peltier*, 505 F.3d 389, 391-92 (5th Cir. 2007).

[22] *Puckett v. United States*, 556 U.S. 129, 135 (2009).

[23] *Id.*

No. 10-11077

Under 18 U.S.C. § 3553(a)(6), a district court must consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."[24]  However, this rule does not apply to "sentencing disparities between co-defendants who might not be similarly situated."[25]  As the district court reasonably concluded, Usman and his co-defendants were not similarly situated.  Usman thus has not shown any error with regard to the substantive reasonableness of his sentence.

## III.

The sentence imposed by the district court is AFFIRMED.

---

[24] *See United States v. Guillermo Balleza*, 613 F.3d 432, 435 (5th Cir. 2010) (quoting 18 U.S.C. § 3553(a)(6)).

[25] *Id.*