# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20261

United States Court of Appeals
Fifth Circuit

**FILED**

April 18, 2017

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SHARON IGLEHART, M.D.,

Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:13-CR-746-1

Before BARKSDALE, GRAVES, and HIGGINSON, Circuit Judges.

PER CURIAM:*

In challenging her conviction and sentence for Medicare and Medicaid fraud, Sharon Iglehart contests the district court's: admitting evidence of Iglehart's prior disciplinary investigation; and ruling concerning the "intended loss" under the advisory Sentencing Guidelines. AFFIRMED.

---

* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 16-20261

I.

Iglehart was a psychiatrist in Houston, Texas, associated with Riverside General Hospital (Riverside). In addition to its inpatient hospital, Riverside offered "partial hospitalization programs" (PHPs) at off-site facilities. Medicare defines PHPs as providing psychotherapeutic and pharmacologic treatment to patients at least four days per week, for a minimum total of 20 hours per week. It was through her billing practices at two Riverside-owned PHPs—Riverside Southeast Mental Health Program in Houston (Southeast) and Riverside Dallas—that Iglehart was later convicted for, *inter alia*, defrauding Medicare and Medicaid.

Medicare reimburses PHPs for their services, subject to several requirements. Among these requirements, PHPs must comply with federal record-keeping standards; in addition, a licensed physician must personally oversee and document the PHP's treatment programs.

Iglehart worked as medical director and sole psychiatrist at Southeast from 2005 until 2009; Riverside Dallas, from 2011 until 2012. In this role, she was responsible for admitting patients, supervising treatment, and billing Medicare. Throughout this entire time period, Iglehart also worked as an attending physician at Riverside's inpatient psychiatric facility.

Over the course of an investigation into Riverside's facilities, the Government discovered evidence of numerous billing irregularities committed by Iglehart. For example, she frequently used her admitting and referral authority to pass patients between Riverside's inpatient program and the PHPs, despite the patients' not being qualified for PHP treatment under Medicare. Moreover, she often backdated signatures and billed Medicare for face-to-face consultations at Riverside Dallas, despite billing for patients in Houston on the same day. Of particular relevance to the evidentiary issue at hand, Iglehart also billed Medicare for patient treatments in Houston, despite her being at a recordkeeping course in San Diego, California, pursuant to a Texas Medical Board (TMB) order, following

No. 16-20261

an investigation in 2004 into Iglehart's billing practices. As a result of these, and other, billing practices, Riverside fraudulently billed Medicare and Medicaid over $22.7 million; Medicare and Medicaid reimbursed Riverside approximately $6.4 million.

Iglehart was indicted on five criminal counts: conspiracy to commit health-care fraud, in violation of 18 U.S.C. § 1349; health-care fraud, in violation of 18 U.S.C. §§ 2, 1347; and three counts of false statements related to a health-care-benefit program, in violation of 18 U.S.C. §§ 2, 1035. At trial, the Government presented voluminous evidence regarding her Medicare billing practices and the conspiracy to pass patients between Riverside and the two PHPs. Iglehart elected to testify at trial, and claimed her errant billing was the result of poor recordkeeping, rather than criminal conduct.

Iglehart was convicted on all five counts. Based in part on the presentence investigation report (PSR), the court sentenced Iglehart to 144 months in prison, applying enhancements pursuant to, *inter alia*, Guidelines §§ 2B1.1(b)(1)(K) and 2B1.1(b)(7)(B)(ii), and granting a downward variance from the advisory Guidelines sentencing range.

II.

Iglehart claims: the court's permitting the admission of evidence of the TMB investigation violated Federal Rule of Evidence 404(b) as inadmissible character evidence; and, the court did not use the proper methodology in calculating her intended loss. (She also asserts the court erred in applying a sentencing enhancement for "abuse of trust". U.S.S.G. § 3B1.3. But, she acknowledges this issue is foreclosed by *United States v. Valdez*, 726 F.3d 684, 694 (5th Cir. 2013), and raises it only to preserve it for possible further review.)

A.

In contending the court erred in admitting evidence regarding the TMB investigation, Iglehart maintains Robert Blech's testimony—which explained Iglehart and TMB, following an investigation, entered into an order requiring,

No. 16-20261

*inter alia*, her to attend the above-referenced recordkeeping course in San Diego—was inadmissible evidence of bad character under Federal Rule of Evidence 404(b). (She does not, however, challenge evidence regarding her presence in San Diego or the content of the recordkeeping training.)

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But, although such evidence is generally inadmissible, it is "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident". Fed. R. Evid. 404(b)(2).

1.

It goes without saying that our court must determine its own standard of review. *E.g.*, *United States v. Rosenthal*, 805 F.3d 523, 528 (5th Cir. 2015). As is also equally well-established: although, generally, evidentiary rulings are reviewed for abuse of discretion, plain-error review applies when a party does not object in district court. *E.g.*, *United States v. Ramos-Rodriguez*, 809 F.3d 817, 821 (5th Cir. 2016); *United States v. Broussard*, 669 F.3d 537, 546 (5th Cir. 2012).

Federal Rule of Evidence 103(b) states: "Once the court rules definitively on the record — either before or at trial — a party need not renew an objection or offer of proof to preserve a claim of error for appeal". Regarding the rule's requiring the court to rule "definitively", persuasive authorities have emphasized the importance of that condition. *See United States v. McElmurry*, 776 F.3d 1061, 1067 (9th Cir. 2015); *United States v. Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015); *United States v. Big Eagle*, 702 F.3d 1125, 1130 (8th Cir. 2013); *United States v. Nixon*, 694 F.3d 623, 628 (6th Cir. 2012).

As noted above, the Government provided evidence of Iglehart's billing Medicare for treatment administered in Houston while she was in San Diego for recordkeeping training. Her participation in the training was required by the above-described TMB order, following investigation into her recordkeeping

No. 16-20261

practices. Along that line, the Government provided notice of its intent to introduce the TMB order, the facts that led to the order, and evidence regarding Iglehart's conduct after the order. In response, she moved *in limine* to exclude this evidence, asserting it would be inadmissible character evidence, in violation of Rules 404(b) and 403.

During trial, a hearing was held on the motion. In ruling, the court stated:

> Well, I -- I think on balance that it's not unfairly prejudicial within the meaning of 403. It is conduct which, in the context of the case as it has unfolded to this point and based upon the -- certainly the defense theory of the case, has a high degree of relevance in achieving the objectives of 404(b) which, among other things, is to show absence of mistake or lack of accident when a demonstration is made that this person has had rather strong therapy or teaching or mentoring on how accurately to keep records.
>
> I'll deny the motion in limine. *I'll let you make your objection depending upon the nature of the offer made.* I don't think that it's -- behooves the government to extend or prolong or -- I could change my mind on this if there's some kind of effort to hang your case on that particular record. I see it as a factor that's, I think, a problem.

(Emphasis added.)

Immediately after the ruling, Iglehart's counsel asked whether "[t]he different findings or just the [TMB] order" would be admissible. The court responded: "Well, this is -- this is what I'm not sure of. I'm not sure what the extent of the [Government's] offer is".

In reply, the Government explained it would offer, *inter alia*: a witness to explain the TMB order, which followed as a result of the investigation (Blech's testimony at trial, discussed *infra*); the order itself (which was never introduced at trial); a witness from the training program to confirm Iglehart's attendance; and some slides from the program's presentation.

5

No. 16-20261

The Government's offer having been clarified, the court stated: "All right. Well, we'll take up the objections as the offer comes. It does appear that it fits within 404(b) in order to demonstrate absence of mistake or lack of accident on the way this -- the records were kept".

Iglehart, however, made no subsequent objection to Blech's testimony, nor did she request a limiting instruction regarding TMB's investigation. Moreover, on direct examination, Iglehart discussed TMB's investigation, stating she "felt a lot of shame" about the sanctions and reprimand. And, with no objection from Iglehart, the Government, during its closing, reminded the jury of TMB's investigation and the resulting "recordkeeping training" in San Diego.

For the challenged testimony, Iglehart urges an abuse-of-discretion standard of review, asserting her motion *in limine* was sufficient to preserve the issue for appeal. Relying upon Rule 103(b)'s not requiring a contemporaneous objection to evidence "[o]nce the court definitively rules on the record", Iglehart maintains the court ruled "definitively" by stating, "I'll deny the motion". The Government contends plain-error review applies because, despite the court's ruling "we'll take up the objections as the offer" was made, Iglehart did not do so.

In the light of the above-quoted colloquy, the court did not rule "definitively" on whether the TMB investigation was admissible evidence. Rather, the court continued to discuss the admissibility of the evidence with counsel for both sides, clarified what would be offered, and finally affirmed it would reconsider the objection at the time of the offer. Based on this record, Iglehart was required to object during trial in order to preserve the issue for appeal.

And, because Iglehart failed to do so, review is only for plain error. *E.g.*, *Broussard*, 669 F.3d at 546. Under that standard, Iglehart must show a forfeited plain (clear or obvious) error that affected her substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If she makes that showing, we have the discretion to correct the reversible plain error, but should do so only if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings". *Id.*

6

No. 16-20261

2.

Our court applies a two-prong test for admissibility under Rule 404(b):  (1) the evidence must be "relevant to an issue other than the defendant's character"; and (2) the evidence's probative value must not be substantially outweighed by its prejudicial effect.  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978) (*en banc*).  As noted above, Iglehart contends Blech's testimony explaining the TMB investigation fails the *Beechum* test as unfairly prejudicial character evidence.  As also noted, she does not challenge the evidence of the San Diego trip or related recordkeeping training, objecting only to the underlying TMB investigation, which gave rise to the San Diego training.  The Government responds, *inter alia*, that the testimony is:  admissible to prove lack of mistake; and probative in order to disprove Iglehart's poor-recordkeeping defense.

At trial, the testimony by Blech, TMB's assistant general counsel, was very brief:

> **Q**: And has Sharon Iglehart been investigated by [TMB]?
> **A**: Yes, she has.
> **Q**: And when was that investigation concluded?
> **A**: The investigation was concluded on July 25th, 2008, and the case was referred to the legal department at the TMB.
> **Q**: And as a result of that investigation, was Dr. Iglehart required to attend a training course for physicians?
> **A**: Yes. She entered into an agreed order, the terms of which required her to attend a PACE medical recordkeeping course.
> **Q**: I'm sorry. PACE medical record --
> **A**: Yes. The -- the PACE is a University of San Diego physician program, and they have a recordkeeping course.

There was no cross-examination.

In its closing, the Government also reminded the jury about the TMB investigation:  "Well, the evidence is that [Iglehart] also was subject to an investigation.  Because of that, she had to go to medical recordkeeping training

7

No. 16-20261

which -- and you'll remember the San Diego trip. . . . But she billed for seeing patients when she was at that mandatory recordkeeping . . . class".

Assuming, *arguendo*, Blech's testimony about the investigation constituted character evidence offered "to show that on a particular occasion [Iglehart] acted in accordance with the character", Rule 404(b)(1), it does not rise to the level of reversible plain error. Applying *Beechum*'s two-prong test, any error was not "clear or obvious": it was not clear or obvious that Blech's testimony was not relevant to an issue other than Iglehart's character (namely, an issue concerning her recordkeeping practices and training); and it was not clear or obvious that the undue prejudice substantially outweighed the probative value. *Beechum*, 582 F.2d at 911. This is especially true given Iglehart's defense theory of poor recordkeeping and her comments, on direct examination, about the TMB sanctions.

Moreover, even assuming, *arguendo*, a plain (clear or obvious) error, given the voluminous evidence of Iglehart's fraudulent-billing practices presented at trial, any such error did not affect her substantial rights. Over the course of a seven-day trial, Iglehart only points to two instances in which the Government mentioned the TMB investigation in a claimed inadmissible manner. In neither instance did the Government explain the underlying basis for the investigation or otherwise imply it was an indicator of guilt in the current prosecution; rather, the Government used the testimony to explain why Iglehart was in San Diego for recordkeeping training, despite billing for patients in Houston (evidence to which she does not object).

B.

Iglehart's second issue concerns whether the court used the proper burden-shifting methodology to calculate "intended loss" under Guidelines §§ 2B1.1(b)(1) and (b)(7). These two Guidelines provide offense-level enhancements based on defendant's intended loss to the Government. *See* U.S.S.G. §§ 2B1.1(b)(1), (b)(7).

No. 16-20261

1.

The parties dispute whether this issue was properly preserved for appeal. The Government contends plain-error review applies because Iglehart objected only generally to the enhancements, rather than specifically to the calculation methodology. Iglehart maintains her written objections to the PSR were sufficient to preserve the issue because she cited *Valdez* and *Isiwele*, which explain the proper burden-shifting methodology. *See Valdez*, 726 F.3d at 696; *United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011). Therefore, she asserts the court's methodology is reviewed *de novo*; factual findings, for clear error.

Arguably, the issue was not preserved. In any event, we need not resolve the question of issue-preservation because Iglehart's contentions fail under either standard. For the purpose of this analysis, therefore, the court's methodology is reviewed *de novo*, and its factual findings for clear error. *See Valdez*, 726 F.3d at 696. Along that line, a factual finding is not clearly erroneous if it is "plausible in light of the record as a whole". *Id.* at 692 (quoting *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008)).

2.

Turning to the substantive issue, Guideline § 2B1.1 provides tiered sentencing enhancements based on the amount of intended loss. In addition to providing tiered enhancements applicable to all theft offenses, the Guideline also provides additional enhancements for health-care-fraud offenses. U.S.S.G. §§ 2B1.1(b)(1) (generic-theft offenses), (b)(7) (health-care-fraud offenses). To calculate loss and determine any appropriate enhancement, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the individual loss, *i.e.*, is evidence sufficient to establish the amount of the intended loss, if not rebutted". U.S.S.G. § 2B1.1 cmt. 3(F)(viii).

Our court has held that, although the amount billed fraudulently to Medicare is *prima facie* evidence, it "does not constitute conclusive evidence of

intended loss; the parties may introduce additional evidence to suggest that the amount billed either exaggerates or understates the billing party's intent". *Isiwele*, 635 F.3d at 203 (internal quotation marks omitted) (quoting *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003)).  Accordingly, our court employs a burden-shifting framework for calculating the intended loss in health-care fraud cases.  *See id.*; *Valdez*, 726 F.3d at 696.  Nonetheless, courts have "wide latitude to determine amount of loss".  *United States v. Jones*, 475 F.3d 701, 705 (5th Cir. 2007).

Using the $22.7 million billed throughout Riverside and Iglehart's conspiracy as *prima facie* evidence, the PSR recommended, *inter alia*, two enhancements based on Iglehart's intended loss:  a 20-level enhancement for a generic-theft offense, with an intended loss between $9.5 and $25 million, pursuant to Guideline § 2B1.1(b)(1)(K); and a four-level enhancement for health-care fraud, with an intended loss in excess of $20 million, pursuant to Guideline § 2B1.1(b)(7)(B)(iii).  As noted, Iglehart's written objection to the PSR's calculated loss cited the above-referenced *Isiwele* and *Valdez* decisions.

In considering Iglehart's objection regarding the generic-theft enhancement, Guideline § 2B1.1(b)(1)(K), the court recognized the *prima facie* evidence likely overstated Iglehart's intended recovery from Medicare and Medicaid, but overruled the objection nonetheless:

> And I am satisfied to accept that, perhaps, [Iglehart] had enough knowledge that she worked through these years of defrauding Medicare to know that she was not going to get the full amount, but she did not have enough knowledge to fine-tune it, certainly, to anything less than 9.5.  And I find abundant evidence to support that intended loss amount within that range of 9.5 million to 25 million, and, therefore, I deny the objection . . . .

In finding the PSR's recommended 20-level generic-theft enhancement applicable, the court made a factual finding that Iglehart intended loss between $9.5 and $25 million.  U.S.S.G. § 2B1.1(b)(1)(K).

No. 16-20261

The court next turned to Iglehart's objection regarding the recommended four-level health-care-fraud enhancement for loss in excess of $20 million. U.S.S.G. § 2B1.1(b)(7)(B)(iii).  The court sustained this objection:

> I find that it is reasonable to conclude that she would have assumed and believed and intended that loss to be not greater than $20 million . . . .  The next level down is between 7 million to 20 million.  The adjustment is for three levels.  That is what I find is correct in this instance, giving the appropriate measure of credence to her claim of knowing that not everything gets paid by Medicare and, at the same time, recognizing that at least 9.5 million, somewhere less than 20 million, would have been the intended loss.

Accordingly, the court applied a three-level health-care-fraud enhancement, which applies for intended loss between $7 and $20 million. U.S.S.G. § 2B1.1(b)(7)(B)(ii).  Taken together with the 20-level generic-theft enhancement, the court found Iglehart intended loss of at least $9.5 million (based on the generic-theft enhancement), but less than $20 million (based on the health-care-fraud enhancement).  As there were no relevant Guidelines thresholds within that range, the court did not further specify its calculation.

As stated, Iglehart maintains the court did not follow the burden-shifting methodology for calculating intended loss.  *See* U.S.S.G. § 2B1.1 cmt. 3(F)(viii); *Valdez*, 726 F.3d at 696; *Isiwele*, 635 F.3d at 203.  She asserts the *prima facie* evidence was rebutted by showing Medicare only paid $6.4 million of the $22.7 million billed; accordingly, she contends the court should have then required the Government to produce evidence of her subjective intent to cause loss in excess of $6.4 million.

The Government counters that the court followed the proper methodology articulated in *Isiwele* and *Valdez* by acknowledging that the *prima facie* evidence (*i.e.*, the billed amount) overstated Iglehart's intent.  The Government further maintains the court did not err by considering Iglehart's knowledge and subjective

expectations regarding the Medicare billing process in order to conclude she intended loss in excess of $9.5 million.

Although the court did not articulate a step-by-step methodology (which it's not required to do), it explained its reasoning for the applicability of each enhancement:   it rejected the *prima facie* evidence; considered evidence of Iglehart's subjective knowledge; and made a factual finding for the range of her intended loss.    Especially given the "wide latitude" courts are afforded in calculating loss, the conclusion that Iglehart's intended loss was between $9.5 and $20 million was "plausible in light of the record as a whole".  *Jones*, 475 F.3d at 705; *Valdez*, 726 F.3d at 692.  Accordingly, the court did not err in applying the enhancements under Guidelines §§ 2B1.1(b)(1)(K) and (b)(7)(B)(ii).

### III.

For the foregoing reasons, the judgement is AFFIRMED.